UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARGONAUT INSURANCE
COMPANY, ZURICH AMERICAN
INSURANCE COMPANY

      Plaintiff,

VS.                                                                      CIVIL ACTION NO.:  1:24-cv-10971-RGS


GID INVESTMENT ADVISERS                    **FIRST AMENDED COMPLAINT**
CORPORATION, WINDSOR
PROPERTY MANAGEMENT
COMPANY

      Defendants.

_____

# I.
# INTRODUCTION

1.     Plaintiffs Argonaut Insurance Company ("Argonaut") and Zurich American Insurance Company ("Zurich" and with Argonaut, the "Plaintiffs") bring this action seeking declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure to determine the rights and obligations of the parties under a Follow Form Excess Insurance Policy, Policy No. MLX4244704-3 issued by Argonaut to Defendant GID Investment Advisers Corporation ("GID") for the policy period October 1, 2022 to October 1, 2023 (the "Argo First Excess Policy") and under an Excess Select Insurance Policy No. EOC 6527312 00 issued by Zurich to GID for the policy period October 1, 2022 to October 1, 2023 (the "Zurich Second Excess Policy" and with the Argo First Excess Policy, the "Excess Policies").

2.     Plaintiffs seek declaratory judgment that they owe no coverage to any insureds under the Excess Policies (non-duty to defend) for the putative class action lawsuit captioned, *Zhovmiruk v. RealPage, Inc., et al.,* No. 2:22-cv-01779 (W.D. Wash. Dec. 16, 2022) (the

4860-0559-1992.3

"Zhovmiruk Litigation"), which was later transferred and consolidated into a multi-district litigation captioned, *Goldman v. RealPage, Inc., et al.*, pending in the United States Middle District of Tennessee, Nashville Division, Case No. 3:23-md-03071 (the "MDL Litigation" and collectively with the Zhovmiruk Litigation, the "Litigation").

3.    The Plaintiffs seek a declaratory judgment determining that the Litigation is not covered under the Excess Policies because the Professional Services Exclusion in the Asset Management Protector℠ Policy No. 6805-2277 ("Primary Policy") issued by primary insurer Federal Insurance Company ("Chubb") to GID for the Policy Period of October 1, 2022 to October 1, 2023 precludes coverage and, therefore, any payment by Chubb under the Primary Policy does not qualify as a payment of Loss which erodes the Underlying Insurance in the Excess Policies.

## II.
## JURISDICTION AND VENUE

4.    This action is filed under and pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §2201.

5.    Jurisdiction of this Court over this action is invoked pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship between Plaintiffs and Defendants.

6.    The matter in controversy exceeds, exclusive of interest and costs, the sum of Seventy-Five Thousand Dollars ($75,000).

7.    Venue in this District is proper under 28 U.S.C. § 1391(b) (1) (2), and (3).

8.    An actual case and controversy of a justiciable nature exists between the parties, involving the rights and obligations of the parties under the Excess Policies.

## III.
## THE PARTIES

9.    Argonaut is a corporation organized and existing under the laws of the state of Illinois with its principal place of business in Illinois.

-2-

10. Zurich is a corporation organized and existing under the laws of the state of New York with its principal place of business in Illinois.

11. Upon information and belief, Defendant GID is a Delaware corporation with its principal place of business in Boston, Massachusetts.

12. Upon information and belief, Defendant Windsor Property Management Company ("Windsor") is a Delaware corporation with its principal place of business in Boston, Massachusetts.

## IV.
## THE POLICIES

13. As noted above, Chubb issued an Asset Management Protector℠ to GID for the Policy Period of October 1, 2022 to October 1, 2023. The Primary Policy consists of several coverage parts, each with its own limit of liability, subject to a maximum aggregate limit of liability for all Loss under the Primary Policy of $5,000,000. As is relevant here, the Primary Policy's Directors & Officers Liability Coverage Part ("D&O Part") has an Aggregate Limit of Liability of $5,000,000, subject to a $500,000 Retention for each Claim. A copy of the Primary Policy is attached hereto as Exhibit 1.

14. The Argo First Excess Policy contains a limit of liability of $5 million excess to $5 million in Underlying Insurance (excess of the relevant retention) and follows form to the Primary Policy except where otherwise noted. A copy of the Argo Excess Policy is attached hereto as Exhibit 2.

15. The Zurich Second Excess Policy contains a limit of liability of $5 million excess to $10 million in Underlying Insurance (excess of the relevant retention) and follows form to the Primary Policy except where otherwise noted. A copy of the Zurich Second Policy is attached hereto as Exhibit 3.

4860-0559-1992.3

## V.
## RELEVANT POLICY PROVISIONS

### A.    The Primary Policy

16.    Insuring Clause I.C. of the D&O Part of the Primary Policy provides as follows:

The Company shall pay, on behalf of an **Organization**, **Loss** which such **Organization** becomes legally obligated to pay on account of any **Claim** first made against the **Organization** during the **Policy Period** or, if exercised, during the **Extended Reporting Period**, for a **Wrongful Act** by the **Organization** before or during the **Policy Period**.

17.    The Policy defines **Organization** to include GID and any Subsidiary.  See General Terms and Conditions ("GTC"), Section II.P.

18.    Section II. of the D&O Part of the Primary Policy, as amended by Endorsement Nos. 13 and 14, defines **Loss** as follows:

**Loss**  means the amount that an **Insured** becomes legally obligated to pay on account of any **Claim**, including but not limited to damages (including punitive, exemplary, or multiplied damages, if and to the extent that such punitive, exemplary or multiplied damages are insurable under the law of the jurisdiction most favorable to the insurability of such damages; provided such jurisdiction has a substantial relationship to the relevant **Insured**, to the Company, or to the **Claim** giving rise to the damages), judgments, settlements, pre-judgment and post-judgment interest, and **Defense Costs**.

**Loss** shall not include any portion of such amount that constitutes any:

(1)    any costs incurred by an **Insured** to comply with any order for injunctive or other non-monetary relief, any agreement to provide such relief, or any regulatory or administrative directive;

(2)    taxes, fines or penalties, except:

(1)    as provided above with respect to punitive, exemplary or multiplied damages; or

…

(3)    any amount not insurable under the law pursuant to which this Policy is construed, except as provided above with respect to punitive, exemplary or multiplied damages;

(4)    regular or overtime wages, salaries, commissions, or fees of **Insured Persons**; or

-4-

(5)     any amount that represents or is substantially equivalent to an increase in any consideration paid (or proposed to be paid) by an **Organization** in connection with its purchase of any securities or assets.

19.     Section III.J. (the "Professional Services Exclusion") of the D&O Part provides as follows:

The Company shall not be liable for **Loss** on account of any **Claim** under this Coverage Part:

(J)     based upon, arising from, or in consequence of performing or the failure to perform any professional service; provided this Exclusion III.(J) shall not apply to any **Claim** brought by or on behalf of a securityholder of the **Organization** in his or her capacity as such;

20. Section VII.A of the General Terms and Conditions of the Chubb Policy provides:

(A)     It shall be the duty of the **Insured** and not the duty of the Company to defend **Claims** made against the **Insured**. The **Insured** shall have the sole obligation under this Policy to retain defense counsel, which shall be subject to the approval of the Company, which shall not be unreasonably withheld.

**B.     The Excess Policies**

21.     Section I. (Insuring Agreement) of the Argo First Excess Policy provides as follows:

This insurance shall apply as excess of all applicable **Underlying Insurance**.  Except as otherwise provided herein, the insurance afforded hereunder shall apply in conformance with the provisions of the **Followed Policy**.  The insurance afforded under this Policy shall not apply unless and until all **Underlying Insurance** has been exhausted by payment of **Loss**. The collectability of any **Underlying Insurance** (in whole or in part), whether because of financial impairment or insolvency of an underlying insurer or for any other reason, is expressly retained by the **Insured(s)** and is not insured or assumed by the **Insurer.**

22.     Endorsement No. 1 to the Argo First Excess Policy identifies the Followed Policy as the Primary Policy.

4860-0559-1992.3

23.    Section I. (Insuring Clause) of the Zurich Second Excess Policy provides as follows:

> INSURING CLAUSE - The Underwriter shall provide the **Policyholder** with insurance coverage during the **Policy Period** excess of the **Underlying Insurance**. The **Policyholder** may have the right to purchase an extended reporting period for purposes of reporting claims during the extended reporting period. Coverage under this policy shall attach only after:
>
> A.    all the Limits of Liability of the **Underlying Insurance** have been exhausted solely as a result of the actual payment of covered loss(es); or
>
> B.    the **Policyholder** and/or any other insurer(s), entity, or individual on behalf of the **Policyholder** has paid up to the full limits of liability for such loss, and satisfied any deductible(s) or retention amount(s) of the **Underlying Insurance** on behalf of the insurer(s) of any **Underlying Insurance**, including coverage provided pursuant to a difference in conditions policy.
>
> Coverage under this policy shall then apply in conformance with and subject to the warranties, if permitted, limitations, conditions, provisions, and other terms of the **Followed Policy**, together with the warranties, if permitted, and limitations of any other Underlying Insurance. In no event shall coverage under this policy be broader than coverage under any **Underlying Insurance**. In the event of reduction or exhaustion of all the Limits of Liability of the **Underlying Insurance** solely as a result of the payment of covered loss(es), this policy shall: (1) in the event of reduction, pay excess of the reduced Limit(s) of Liability of the **Underlying Insurance**, or (2) in the event of exhaustion, continue in force as primary or governing insurance excess of the applicable deductible(s) or retention amount(s) in the **Followed Policy**, which deductible(s) or retention(s) shall be applied to any subsequent covered loss as specified in the **Followed Policy**

24.    Item 3. Underlying Insurance in the Declarations of the Zurich Second Excess Policy identifies the Followed Policy as the Primary Policy  and identifies the Other Underlying Insurance as the Argo First Excess Policy.

4860-0559-1992.3

## VI.
## FACTUAL BACKGROUND OF THE LITIGATION

25. The following factual background is alleged on information and belief based on the allegations and averments of the matters referenced below.

26. The Zhovmiruk Litigation was transferred and consolidated into a MDL Litigation. The Second Amended Consolidated Class Action Complaint ("Complaint") filed in the MDL Litigation is the operative complaint. A copy of the Complaint is attached hereto as Exhibit 4.

27. The Complaint is brought on behalf of certain plaintiffs in their individual capacity and on behalf of a putative class, and alleges various federal and state law antitrust violations against multiple defendants grouped into the following categories: RealPage, Managing Defendants, Owner-Operators, and Owners.

28. Windsor is named as a defendant in the Litigation and is included in the Owner-Operators category.

29. The Class is defined as follows:

> All persons and entities in the United States and its territories who paid rent on at least one multifamily residential real estate lease from any Owner, Managing Defendants and/or Owner-Operator participating in RealPage's Revenue Management Solutions, including its pricing software and/or lease renewal staggering software programs, or from a division, subsidiary, predecessor, agent, or affiliate of any such Owner, Managing Defendant, and/or Owner-Operator, at any time during the period of October 18, 2018 until the Defendants' unlawful conduct and its anticompetitive effects cease to persist ("Class Period").

30. In short, the Class consists of renters who were the alleged victims of the price fixing conspiracy.

31. As to Windsor, the Complaint alleges that Windsor operates in at least the following regional submarkets: Atlanta, Austin, Baltimore, Boston, Charlotte, Chicago, Dallas-Fort Worth,

-7-

4860-0559-1992.3

Denver, Houston, Los Angeles, Miami, New York, Portland, San Diego, San Francisco, San Jose, Seattle, and Washington.

32.    The Complaint further alleges that during the purported Conspiracy Period (January 2016 through to the present), Windsor entered into a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its more than 86,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Windsor to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices.

33.    The Complaint further alleges that to achieve this, the Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country, causing substantial damages to Plaintiffs and other members of the Class whose ability to obtain affordable housing depended on getting competitive prices for the units they rented.

34.    The Complaint further alleges that the mechanism to effectuate the nationwide conspiracy was an integrated technology platform and software developed by RealPage that used a database of rental prices in the area (including competitors' prices) and provided the optimal price to charge prospective tenants, with both the short-and-long-term goals of increasing revenues by raising rents.

35.    The Complaint further alleges that RealPage provided this confidential, non-public information to cartel members before they implemented or adjusted the rent prices they charged to renters.

4860-0559-1992.3

36.     The Complaint further alleges that to participate in this nationwide conspiracy, each of the Defendants had to contribute non-public, competitively sensitive data to RealPage's data pool and agree to price their multi-family rental units according to RealPage's RMS.

37.     The Complaint further alleges that a ProPublica article from October 2022 shed light on Defendants' conspiracy and that as a consequence of this article, multiple members of Congress have urged the Department of Justice ("DOJ") and the Federal Trade Commission to investigate the collusion facilitated by the collection and use of rent data input and exchanged through RealPage's RMS.

38.     The Complaint further alleges that while the DOJ has yet to announce any formal investigation into RealPage, Plaintiffs are informed and believe, and based upon such information and belief, allege that the DOJ, along with various State Attorneys General have launched investigations into the anticompetitive conduct alleged herein.

39.     Further, the DOJ[1] has announced that it will hold an expert workshop "to inform potential guidance updates around anticompetitive information sharing" in consumer facing markets, including the multifamily rental housing market.

40.     The Complaint further alleges that Defendants' price-fixing conspiracy is a *per se* unlawful restraint of trade under Section 1 of the Sherman Act. The Complaint further alleges that the first complaint against RealPage was filed on October 18, 2022 and the alleged conspiracy began at least as early as January 1, 2016.

41.     Based on these allegations, the Complaint asserts two Counts - Count I for price fixing in violation of the Sherman Act (15 U.S.C. § 1) and Count II for violation of various State antitrust statutes. Under Count I, the Complaint seeks treble damages, attorney's fees and costs,

---

[1] It is the Plaintiffs' understanding that in December 2023, the DOJ filed a statement of interest in the Litigation arguing that the complaints adequately allege violations of the Sherman Antitrust Act.

4860-0559-1992.3

and injunction. Under Count II, the Complaint seeks damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state law.

## VII.
## COVERAGE ISSUES

42.     Upon information and belief, Chubb issued a coverage letter dated January 23, 2023 ("Chubb Jan. 2023 Letter") in connection with the Litigation in which Chubb denied coverage pursuant to the Professional Services Exclusion of the D&O Part of the Primary Policy.

43.     Upon information and belief, since the denial letter, Chubb and GID exchanged multiple correspondence including a letter from Joseph M. Saka dated October 27, 2023 (the "GID Letter").

44.     Although Argonaut requested copies of the Chubb Jan. 2023 Letter, the GID Letter, and additional correspondence between Chubb and GID, Plaintiffs have not received any of the letters.

45.     Chubb then issued a coverage position letter dated November 15, 2023 in connection with the Litigation ("Chubb Nov. 2023 Letter") whereby Chubb reversed its coverage denial and agreed to provide coverage for Windsor in the Litigation subject to various reservation of rights including pursuant to the Professional Services Exclusion. A copy of the Chubb Nov. 2023 Letter is attached hereto as Exhibit 5.

46.     In the Chubb Nov. 2023 Letter, it continues to assert that coverage for the Litigation may not exist as a result of the Professional Services Exclusion.

4860-0559-1992.3

47.     As such, by letter dated April 15, 2024, Argonaut issued a coverage position letter denying coverage for the Litigation pursuant to the Professional Services Exclusion and reserving rights on other terms and conditions (attached as Exhibit 6).

48.     By letter dated April 15, 2024, Zurich also issued a coverage position letter denying coverage for the Litigation pursuant to the Professional Services Exclusion and reserving rights on other terms and conditions(attached as Exhibit 7).

## **FIRST CAUSE OF ACTION**

### **(Declaratory Relief that the Professional Services Exclusion Bars Coverage for the Litigation in its Entirety)**

49.     Plaintiffs repeat and reallege the allegations of Paragraphs 1 through ___ as if set forth herein.

50.     The Litigation was noticed under the Excess Policies.

51.     Coverage is not available for the Litigation as the Professional Services Exclusion of the Primary Policy applies.

52.     Professional Services Exclusion, to which the Excess Policies follow form, states that there is no coverage for Loss on account of any Claim under the D&O Part based upon, arising from, or in consequence of performing or the failure to perform any professional services.

53.     The Litigation is based upon, arising from and in consequence of Windsor's rendering of Professional Services.

54.     Indeed, according to GID's website, Windsor is described as the property management arm:

> Windsor Communities is the firm's exclusive in-house property management arm. For over half a century, Windsor has earned a reputation for outstanding property maintenance and property-level financial performance and has been recognized as a leader in

resident satisfaction by ORA and Kingsley. Property Management provides the following services to GID:

- Marketing
- Leasing
- Property management
- Maintenance
- Construction management
- Resident Services
- Collections
- Underwriting – new deals
- Integration
- Technology

55.     GID's website even describes one of Windsor's core competencies as "best practices technology platform, including SEO and marketing analytics, daily pricing optimization, data warehouse and visualization tools, responsive-design prospect and resident portals, and resident package-handling solutions." Indeed, among the services offered by Windsor are leasing, property management, collections, and technology.

56.     All of these professional services and more are detailed in the Litigation as the alleged Wrongful Acts being committed by Windsor and other defendants.  The Complaint centers on how Defendants including Windsor utilized RealPage's technology to collude with their competitors to ensure an inflated rental pricing mechanism so that their customers - the renters - will continue to pay higher rates as opposed to competitive rates. The plaintiffs who were allegedly harmed are the residents/lessees that defendants are supposed to service.

57.     As such, the Professional Services Exclusion applies and there is no coverage for Windsor in the Litigation under the Excess Policies.

58.     Accordingly, Plaintiffs seek declaratory judgment by this Court of Plaintiffs' and Defendants' respective duties and obligations under the Excess Policies regarding the applicability of the Professional Services Exclusion in barring coverage for the Litigation in its entirety.

4860-0559-1992.3

## SECOND CAUSE OF ACTION

### (Declaratory Relief that The Underlying Insurance Has Not Been Fully Exhausted)

59.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through __ as if set forth herein.

60.     The Argo Excess Policy is not triggered until the Primary Policy has been fully exhausted through the actual payment of Loss. See Exhibit 2, Section I.

61.     The Zurich Second Excess Policy is not triggered until the Primary Policy and the Argo Excess Policy have been fully exhausted through the actual payment of Loss. See Exhibit 3, Section I.

62.     To the extent the Court determines that the Professional Services Exclusion bars coverage for the Litigation in part or in its entirety, Plaintiffs seek a declaratory judgment by the Court of Plaintiffs' and Defendants' respective duties and obligations under the Excess Policies regarding whether the Excess Policies have been triggered.

## PRAYERS FOR RELIEF

**WHEREFORE**, the Plaintiff respectfully requests that this Court enter an Order:

(a)     declaring that the Excess Policies provide no coverage for the Litigation in its entirety pursuant to the Professional Services Exclusion;

(b)     declaring that the Excess Policies have not been triggered as the Underlying Insurance have not been exhausted by covered Loss; and

(c)     awarding such other and further relief as the Court deems necessary and proper.

4860-0559-1992.3

**JURY DEMAND**

Plaintiffs demand a jury trial on all claims so triable.


Dated: April 29, 2024                    Respectfully submitted,


                                    By: /s/ *Brian A. O'Connell*
                                         Brian A. O'Connell, BBO#551182
                                         Tucker, O'Connell & Fidurko, LLP
                                         199 Wells Avenue, Suite 301
                                         Newton, MA  02459
                                         617-986-6226
                                         oconnell@toflawfirm.com


                                         Geoffrey Heineman
                                         [*Pro hac vice motion to be served and filed*]
                                         Jung H. Park
                                         [*Pro hac vice motion to be served and filed*]
                                         Ropers Majeski PC
                                         750 Third Avenue, 25th Floor
                                         New York, NY 10017
                                         Geoffrey.heineman@ropers.com
                                         Jung.park@ropers.com

                                         *Attorneys for Plaintiffs Argonaut Insurance*
                                         *Company and Zurich American Insurance*
                                         *Company*


**CERTIFICATE OF SERVICE**

        I, Brian A. O'Connell, hereby certify that on April 29, 2024, I filed and served this document through the electronic filing system and the document is available for viewing and/or downloading from the United States District Court District of Massachusetts using the CM/ECF system, which will send notification to counsel of record


                                         /s/ *Brian A. O'Connell*
                                         Brian A. O'Connell, BBO#551182


-14-

4860-0559-1992.3