**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARGONAUT INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>GID INVESTMENT ADVISERS CORPORATION, WINDSOR PROPERTY MANAGEMENT COMPANY,<br><br>Defendants. | Case No.: 1:24-cv-10971-RGS<br><br>ANSWER TO FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS<br><br>JURY TRIAL DEMANDED |

**ANSWER TO FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS WITH JURY DEMAND AGAINST ARGONAUT INSURANCE COMPANY AND ZURICH AMERICAN INSURANCE COMPANY**

Defendants GID Investment Advisers Corporation and Windsor Property Management Company (collectively, "Defendants"), by and through undersigned counsel, answers and responds to the First Amended Complaint for Declaratory Judgement filed by Plaintiffs Argonaut Insurance Company and Zurich American Insurance Company (collectively, "Plaintiffs"), as follows:

**INTRODUCTION**

1. Defendants admit that Plaintiffs purport to bring this action for a judicial declaration of rights and obligations with respect to the Follow Form Excess Insurance Policy, (Policy No. MLX4244704-3) sold by Argonaut and the Excess Select Insurance Policy (Policy

1

No. EOC 6527312 00) sold by Zurich to Defendants for the Policy Period of October 1, 2022, to October 1, 2023. But Defendants deny that Plaintiffs are entitled to any relief. Defendants admit only that Plaintiffs sold the Excess Policies to Defendants. Defendants refer to the Policies themselves and deny any allegations that are inconsistent with the terms and conditions of the Policies. Defendants deny all other allegations not expressly admitted.[1]

2. Defendants admit that Plaintiffs purport to bring this action for a judicial declaration of rights and obligations with respect to the Excess Policies. But Defendants deny that Plaintiffs are entitled to any relief. Defendants deny that Plaintiffs accurately summarize the procedural history and posture of the cases filed against Windsor, including the *Zhovmiruk v. RealPage, Inc., et al.*, No. 2:22-cv-01779 (W.D. Wash. Dec. 16, 2022), which, with other lawsuits, was referred to the Judicial Panel on Multidistrict Litigation and transferred to the Middle District of Tennessee to be assigned to Judge Waverly D. Crenshaw, Jr. under the caption *In Re: RealPage, Inc. Rental Software Antitrust Litigation (No. II)*, No. 3:23-md-03071 (M.D. Tenn.) (the "Underlying Litigation"). Defendants deny all other allegations not expressly admitted.

3. Defendants admit that Plaintiffs purport to bring this action for a judicial declaration of rights and obligations with respect to the Underlying Litigation. But Defendants deny that Plaintiffs are entitled to any relief and deny that the Professional Services Exclusion in the Primary Policy precludes coverage for any Loss incurred in the Underlying Litigation. Defendants refer to the Primary Policy and deny any allegations that are inconsistent with the terms and conditions of the Primary Policy. Defendants deny all other allegations not expressly admitted.

**JURISDICTION AND VENUE**

4. Defendants admit that Plaintiffs purport to file this action under and pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §2201. But Defendants deny that Plaintiffs are entitled to any relief.

---

[1] While Plaintiffs refer to GID Investment Advisers Corporation as "GID," Defendants refer to GID Investment Advisers Corporation as "GIAC."

5.    Admitted.

6.    Admitted.

7.    Admitted.

8.    Admitted.

## THE PARTIES

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted.

## THE POLICIES

13.    Defendants admit that Chubb issued a policy to GIAC covering the policy period of October 1, 2022 to October 1, 2023.  Defendants refer to the Primary Policy for its complete terms and deny any allegations that are inconsistent with the terms and conditions of the Primary Policy. Defendants deny all other allegations not expressly admitted and further state that the entire Primary Policy, not just the Directors & Officers Liability Coverage, is "relevant."

14.    Defendants admit that Argonaut sold the Argo First Excess Policy which follows form to the Primary Policy except where otherwise noted and refer to the Argo First Excess Policy for its complete terms.  Defendants deny any allegations that are inconsistent with the terms and conditions of the Argo Excess Policy.

15.    Defendants admit that Zurich sold the Zurich Second Excess Policy which follows form to the Primary Policy except where otherwise noted and refer to the Zurich Second Excess Policy for its complete terms.  Defendants deny any allegations that are inconsistent with the terms and conditions of the Zurich Second Excess Policy.

## RELEVANT POLICY PROVISIONS

### A. The Primary Policy

16.    Defendants admit that Plaintiffs purport to selectively quote from the Primary Policy. Defendants refer to the Primary Policy for its complete terms and deny any allegations that are inconsistent with the terms and conditions of the Primary Policy. Defendants deny all other allegations not expressly admitted.

17.    Defendants admit that Plaintiffs purport to selectively quote from the Primary Policy and admit that GIAC and Windsor are insured under the Primary Policy. Defendants refer to the Primary Policy for its complete terms and deny any allegations that are inconsistent with the terms and conditions of the Primary Policy. Defendants deny all other allegations not expressly admitted.

18.    Defendants admit that Plaintiffs purport to selectively quote from the Primary Policy. Defendants refer to the Primary Policy for its complete terms and deny any allegations that are inconsistent with the terms and conditions of the Primary Policy. Defendants deny all other allegations not expressly admitted.

19.    Defendants admit that Plaintiffs purport to selectively quote from the Primary Policy. Defendants refer to the Primary Policy for its complete terms and deny any allegations that are inconsistent with the terms and conditions of the Primary Policy. Defendants deny all other allegations not expressly admitted.

20.    Defendants admit that Plaintiffs purport to selectively quote from the Primary Policy. Defendants refer to the Primary Policy for its complete terms and deny any allegations that are inconsistent with the terms and conditions of the Primary Policy. Defendants deny all other allegations not expressly admitted.

### B. The Excess Policies

21.    Defendants admit that Plaintiffs purport to selectively quote from the Argo First Excess Policy. Defendants refer to the Argo Excess Policy for its complete terms and deny any

allegations that are inconsistent with the terms and conditions of the Argo Excess Policy. Defendants deny all other allegations not expressly admitted.

22.     Admitted.

23.     Defendants admit that Plaintiffs purport to selectively quote from the Zurich Second Excess Policy. Defendants refer to the Zurich Second Excess Policy for its complete terms and deny any allegations that are inconsistent with the terms and conditions of the Zurich Second Excess Policy. Defendants deny all other allegations not expressly admitted.

24.     Admitted.

25.     Denied, as this paragraph does not contain assertions of fact requiring a response under the Federal Rules of Civil Procedure.

26.     Defendants admit only that the Zhovmiruk Litigation, with other actions, was referred to the Judicial Panel on Multidistrict Litigation and transferred to the Middle District of Tennessee to be assigned to Judge Waverly D. Crenshaw, Jr. under the caption *In Re: RealPage, Inc. Rental Software Antitrust Litigation (No. II)*, No. 3:23-md-03071 (M.D. Tenn.) and that Exhibit 4 is a copy of the Second Amended Consolidated Class Action Complaint filed in the Underlying Litigation. Defendants lack knowledge or information sufficient to form a belief about the truth of the characterization of any complaint as the "operative" complaint and on that basis deny that characterization. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content.

27.     Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

28.     Defendants admit only that Windsor is named as a defendant in the Underlying Litigation and is alleged to be an "Owner-Operator" as that term is defined in the Complaint. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

29.     Defendants admit only that Plaintiffs selectively quote from the Complaint. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation and deny that the group referred to as a "class" in the Complaint constitutes a proper class under Rule 23 of the Federal Rules of Civil Procedure. Defendants further deny that class certification is appropriate in the Underlying Litigation and assert that no determination regarding class certification has been made by the presiding court.

30.     Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation and deny that the group referred to as a "class" in the Complaint constitutes a proper class under Rule 23 of the Federal Rules of Civil Procedure. Defendants further deny that class certification is appropriate in the Underlying Litigation and assert that no determination regarding class certification has been made by the presiding court. Defendants deny all other allegations not expressly admitted.

31.     Defendants admit that the Complaint so alleges but deny the accuracy of that allegation. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual

content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

32.    Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted

33.    Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny all other allegations not expressly admitted

34.    Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

35.    Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

36.    Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint

itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

37.    Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

38.    Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation.

39.    Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

40.    Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

41.     Defendants admit only that Plaintiffs purport to selectively characterize the Complaint but deny that Plaintiffs fully and accurately do so. Defendants refer to the Complaint itself for a complete statement of the allegations and deny any summaries or characterizations of the Complaint that are inconsistent with its actual content. Defendants deny any liability in connection with the Complaint in the Underlying Litigation. Defendants deny all other allegations not expressly admitted.

## COVERAGE ISSUES

42.     Defendants admit that Chubb issued a letter dated January 23, 2023, but deny that Plaintiffs fully and accurately describe the letter and deny that the January 23, 2023 letter accurately reflects Chubb's current coverage position in connection with the Underlying Litigation. Defendants deny any allegations that are inconsistent with Chubb's January 2023 Letter, and Defendants refer to the letter itself for the statements or positions contained therein. Defendants deny all other allegations not expressly admitted.

43.     Defendants admit only that since Chubb's January 23, 2023 letter, Chubb and Defendants have exchanged additional correspondence including a letter from Mr. Saka dated October 27, 2023. Defendants deny all other allegations not expressly admitted.

44.     Defendants deny that the Plaintiffs ever requested copies of any correspondence from Defendants. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations contained in this paragraph, and therefore deny them. Defendants further state that Defendants have never refused to provide a copy of any correspondence and deny any implication that any requests were ever refused.

45.     Defendants admit only that Chubb issued a letter dated November 15, 2023, in which Chubb has agreed to provide coverage for Windsor in the Underlying Litigation under a reservation of rights and withdrew its prior position that the Professional Services Exclusion bars coverage for the Underlying Litigation. Defendants deny any allegations that are inconsistent with

9

the November 15, 2023 Letter, and Defendants refer to the letter itself for the statements or positions contained therein. Defendants deny all other allegations not expressly admitted.

46.    Defendants admit only that Chubb issued a letter dated November 15, 2023, in which Chubb has agreed to provide coverage for Defendants in the Underlying Litigation under a reservation of rights and withdrew its prior position that the Professional Services Exclusion bars coverage for the Underlying Litigation. Defendants deny any allegations that are inconsistent with the November 15, 2023 letter, and Defendants refer to the letter itself for the statements or positions contained therein. Defendants deny all other allegations not expressly admitted.

47.    Defendants admit only that, after Plaintiffs filed this lawsuit, Plaintiffs surreptitiously sent a letter denying coverage for the Underlying Litigation based on the Professional Services Exclusion. Defendants deny that the letter was sent on April 15, 2024, or that Exhibit 6 to the Amended Complaint reflects the letter that was sent. Defendants deny any allegations that are inconsistent with the April 2024 letter, and Defendants refer to the letter itself for the allegations contained therein.

48.    Defendants admit only that, after Plaintiffs filed this lawsuit, they surreptitiously sent correspondence denying coverage for the Underlying Litigation based on the Professional Services Exclusion. Defendants deny that the letter was sent on April 15, 2024. Defendants deny any allegations that are inconsistent with the April 2024 letter, and Defendants refer to the letter itself for the allegations contained therein.

## FIRST CAUSE OF ACTION

**(Declaratory Relief that the Professional Services Exclusion Bars Coverage for the Litigation in its Entirety)**

49.    Defendants are unable to respond to this paragraph as written due to a typographical error that omits specific paragraph references. To the extent Plaintiffs are incorporating paragraphs prior to this paragraph, Defendants likewise incorporate their answers to those paragraphs.

50.    Admitted.

51.     Denied.

52.     Defendants admit only that the Excess Policies follow form to the Professional Services Exclusion in the Primary Policy. Defendants deny that Plaintiffs accurately characterize the Professional Services Exclusion. Defendants refer to the Primary Policy and Excess Policies for their complete terms, and Defendants deny any allegations that are inconsistent therewith. Defendants deny all other allegations not expressly admitted.

53.     Denied.

54.     Defendants admit that the text quoted in this paragraph is a partial quote from the website at https://gid.com/ but deny that the quote is relevant or material to the allegations in the Complaint in the Underlying Litigation or to the insurance coverage issues under dispute and deny the characterization of the website as GIAC's website. Defendants object to the inclusion of this partial quote as irrelevant.

55.     Defendants admit only that Plaintiffs purport to selectively characterize and partially quote from statements from the website at https://gid.com/ but deny that Plaintiffs fully and accurately do so. Defendants further deny that material from the website is relevant or material to the allegations in the Complaint in the Underlying Litigation or to the insurance coverage issues under dispute and deny the characterization of the website as GIAC's website. Defendants object to the inclusion of this averment as irrelevant.

56.     Denied. Defendants further state that Plaintiffs are not accurately characterizing the allegations in the Complaint in the Underlying Litigation, and Defendants refer to the Complaint itself for a complete statement of the allegations.

57.     Denied.

58.     Defendants admit that Plaintiffs purport to bring this action for a judicial declaration of rights and obligations with respect to the Excess Policies. But Defendants deny that Plaintiffs are entitled to any relief. Defendants deny all other allegations not expressly admitted.

11

## SECOND CAUSE OF ACTION

### (Declaratory Relief that The Underlying Insurance Has Not Been Fully Exhausted)

59.     Defendants incorporate their response to paragraphs 1 through 58 of the Complaint as if fully set forth.

60.     Defendants admit only that the Argo Excess Policy is an excess policy, but deny that Plaintiffs fully and accurately characterize the attachment language of the Argo Excess Policy. Defendants refer to the Argo Excess Policy itself for the terms contained therein, and Defendants deny any allegations that are inconsistent therewith. Defendants deny all other allegations not expressly admitted.

61.     Denied. Defendants further refer to the Zurich Second Excess Policy itself for the terms contained therein.

62.     Defendants admit that Plaintiffs purport to bring this action for a judicial declaration of rights and obligations with respect to the Excess Policies. But Defendants deny that Plaintiffs are entitled to any relief. Defendants deny all other allegations not expressly admitted.

## RESPONSE TO PRAYER FOR RELIEF

Defendants deny that Plaintiffs are entitled to any relief, including such relief as they have prayed for in subparagraphs (a) through (c) of their Prayer.

Defendants deny each and every allegation of the Complaint not specifically admitted.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

1.     The Complaint fails to state a claim against Defendants upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

2.     The Complaint is barred, in whole or in part, by equitable estoppel.

12

**THIRD AFFIRMATIVE DEFENSE**

3.      The Complaint is barred, in whole or in part, on the ground that Plaintiffs would be unjustly enriched.

**FOURTH AFFIRMATIVE DEFENSE**

4.      The Complaint is barred, in whole or in part, on the ground that Plaintiffs have anticipatorily breached their contractual obligations under the excess insurance policies.

**FIFTH AFFIRMATIVE DEFENSE**

5.      The Complaint is barred, in whole or in part, by the doctrine of unclean hands.

### DEFENDANTS' COUNTERCLAIMS WITH JURY DEMAND

Defendants/Counterclaim Plaintiffs GID Investment Advisers Corporation ("GIAC") and Windsor Property Management Company ("Windsor") (collectively, the "Insureds"), by and through undersigned counsel, bring these Counterclaims against Plaintiff/Excess Insurers Argonaut Insurance Company ("Argonaut") and Zurich American Insurance Company ("Zurich") (collectively, the "Excess Insurers") and allege as follows:

### NATURE OF THE DISPUTE

1. The Insureds assert the following Counterclaims against Excess Insurers: (1) declaratory judgment pursuant to 28 U.S.C. § 2201; (2) breach of contract; and (3) violations of Massachusetts General Law Chapter 93A.

2. The Excess Insurers sold excess insurance policies to the Insureds. Argonaut sold a Follow Form Excess Insurance Policy (Policy No. MLX4244704-3) for the policy period October 1, 2022, to October 1, 2023 (the "Argo First Excess Policy"). Zurich sold GIAC an Excess Select Insurance Policy (Policy No. EOC 6527312 00) for the policy period October 1, 2022, to October 1, 2023 (the "Zurich Second Excess Policy" and with the Argo First Excess Policy, the "Excess Policies"). A true and correct copy of the Excess Policies are attached as **Exhibits A and B**.

3. Federal Insurance Company ("Chubb") sold GIAC an Asset Management Protector℠ Policy (Policy No. 6805-2277) ("Primary Policy") for the Policy Period of October 1, 2022 to October 1, 2023. The Primary Policy consists of several coverage parts, each with its own limit of liability, subject to a maximum aggregate limit of liability for all Loss under the Primary Policy of $5,000,000. A true and correct copy of the Primary Policy is attached as **Exhibit C.**

4. On December 16, 2022, Yelizaveta Zhovmiruk initiated a class action lawsuit in the United States District Court for the Western District of Washington against multiple defendants, including Windsor, in a lawsuit captioned *Zhovmiruk v. RealPage, Inc., et al.*, No. 2:22-cv-01779 (W.D. Wash.). This lawsuit and others were referred to the Judicial Panel on

Multidistrict Litigation and subsequently transferred to the Middle District of Tennessee to be assigned to Judge Waverly D. Crenshaw, Jr. under the caption *In Re: RealPage, Inc. Rental Software Antitrust Litigation (No. II)*, No. 3:23-md-03071 (M.D. Tenn.) ("Underlying Litigation"). A true and correct copy of the Second Amended Complaint in the Underlying Litigation is attached as **Exhibit D**. The Underlying Litigation, brought on behalf of certain plaintiffs in their individual capacity and on behalf of a putative class, alleges various federal and state law antitrust violations against multiple defendants, including Windsor.

5.  Because the Underlying Litigation contains claims that fall within the coverage of both the Primary Policy and the Excess Policies, the Insureds reported the Underlying Litigation to Chubb, Argonaut, and Zurich.

6.  After receiving notice of the Underlying Litigation, the Excess Insurers have summarily denied coverage, including any obligation to advance defense costs, for the Underlying Litigation. In so doing, the Excess Insurers have relied upon an exclusion in the Primary Policy (the "Professional Services Exclusion"). The Excess Insurers have thereby breached their obligations under the Excess Policies and willfully violated Massachusetts General Laws, Chapter 93A.

7.  The Insureds seek a declaration that the Professional Services Exclusion does not excuse the Excess Insurers' coverage obligation for the Underlying Litigation and that, upon the exhaustion of underlying limits, the Excess Insurers are obligated under the Excess Policies to provide coverage, including the advancement of defense costs, for the Underlying Litigation. The Insureds also seek damages for the Excess Insurers' breach of contract and willful violations of Massachusetts General Laws, Chapter 93A.

## PARTIES

8.  Counterclaim Plaintiff GIAC is a corporation organized under the laws of Delaware with its principal place of business in Boston, Massachusetts.

15

9.     Counterclaim Plaintiff Windsor Property Management Company ("Windsor") is a corporation organized under the laws of Delaware with its principal place of business in Boston, Massachusetts.

10.     Upon information and belief, Counterclaim Defendant Zurich is a corporation organized under the laws of New York with its principal place of business in Illinois.

11.     Upon information and belief, Counterclaim Defendant Argonaut is a corporation organized under the laws of Illinois with its principal place of business in Illinois.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the Insureds and Excess Insurers and the amount in controversy exceeds $75,000.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), (2), and (3) because a substantial part of the events giving rise to this suit occurred in this District.

14.     An actual case and controversy of a justiciable nature exists between the parties involving the rights and obligations of the parties under the Excess Policies.

## FACTUAL ALLEGATIONS

**A.     Excess Insurers Sold Broad Excess Liability Coverage to the Insureds.**

15.     Chubb sold the Primary Policy for the Policy Period of October 1, 2022, to October 1, 2023. All premiums for the Primary Policy have been paid, and the Insureds have complied with all terms of the Primary Policy.

16.     Under the Director and Officers Liability Coverage section of the Primary Policy (Ex. C, Insuring Clause C), Chubb agreed to "pay, on behalf of an **Organization, Loss** which such **Organization** becomes legally obligated to pay on account of any **Claim** first made against the **Organization** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** by the **Organization** before or during the **Policy Period**."

17.     Both GIAC and Windsor are "**Organizations**" within the meaning of the Primary Policy.

18.     The term "**Wrongful Act**," is broadly defined to include, among other things, "[a]ny error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted . . . by the **Organization**. . . ."

19.     The term "**Loss**" is defined to include "the amount that an **Insured** becomes legally obligated to pay on account of any **Claim,** including but not limited to damages . . . . judgments, settlements, pre-judgment and post-judgment interest and **Defense Costs**."

20.     Under the Primary Policy, Chubb is obligated to advance **Defense Costs**. Specifically, by endorsement, Chubb agreed that "**Defense Costs** shall be advanced on a current basis, but no later than ninety (90) days after receipt by the **Company** of invoices or bills detailing such **Defense Costs** and all other information requested by the **Company** with respect to such invoices or bills." Ex. C, Endorsement 12 at 67 of 119.

21.     In addition to the D&O Coverage Part, the Primary Policy contains a separate Professional Liability Coverage Part, which is not subject to the Professional Services Exclusion.

22.     GIAC purchased from Argonaut the Argo First Excess Policy for the policy period October 1, 2022, to October 1, 2023. The Argo First Excess Policy identified the followed policy as the Primary Policy and noted that coverage shall apply in conformance with and subject to the Primary Policy. The Argo First Excess Policy follows form to the terms and conditions of the Primary Policy. (**See Exhibit A**)  All premiums for the Argo First Excess Policy have been paid, and the Insureds have complied with all terms of the Argo First Excess Policy.

23.     GIAC purchased from Zurich the Zurich Second Excess Policy for the policy period October 1, 2022, to October 1, 2023. The Zurich Second Excess Policy identified the followed policy as the Primary Policy and the Other Underlying Insurance as the Argo First Excess Policy. Thus, the Zurich Second Excess Policy follows form to the terms and conditions of the Primary Policy. (**See Exhibit B**)  All premiums for the Zurich Second Excess Policy have been paid, and the Insureds have complied with all terms of the Zurich Second Excess Policy.

17

24.    The Excess Insurers had the ability to include broad antitrust exclusions in their insurance policies and have utilized such exclusions in other policy forms.  For example, a true and copy of a policy form filed by Argonaut with state insurance regulators is attached as **Exhibit E**, and true and copies of policy forms filed by Zurich with state insurance regulators are attached as **Exhibits F to G**. Despite having the ability to include these antitrust exclusions, Defendants chose not to include any such exclusion in the policies issued to the Insureds.

**B.    The Insureds Are Named in the Underlying Litigation During the Policy Period.**

25.    On or about December 16, 2022, a class action was initiated against Windsor, among others, in a lawsuit captioned *Zhovmiruk v. RealPage, Inc., et al.*, No. 2:22-cv-01779 (W.D. Wash.). A true and correct copy of the original complaint in the *Zhovmiruk* Litigation is attached as **Exhibit H**. Windsor was subsequently named in two additional lawsuits, *Kabisch v. RealPage. Inc., et al.* No. 3:23-cv-000742 (M.D. Tenn. Jul. 24, 2023); and *Haynes v. RealPage, Inc. et. al.*, 1:23-cv-3813 (N.D. Ga. Aug. 25, 2023). Those cases were referred to the Judicial Panel on Multidistrict Litigation, which transferred all actions to the Middle District of Tennessee to be assigned to Judge Waverly D. Crenshaw, Jr. under the caption *In Re: RealPage, Inc. Rental Software Antitrust Litigation (No. II)*, No. 3:23-md-03071 (M.D. Tenn.), ECF No. 1 ("Underlying Litigation").

26.    Following named plaintiff Zhovmiruk's withdrawal from the case, the parties stipulated to the dismissal of all claims in *Zhovmiruk* on September 27, 2023. Stipulation, *In Re: RealPage, Inc. Rental Software Antitrust Litigation (No. II)*, No. 3:23-md-03071 (M.D. Tenn. Sept. 27, 2023), ECF No. 554. The court ordered *Zhovmiruk* closed on February 22, 2024. Order, *In Re: RealPage, Inc. Rental Software Antitrust Litigation (No. II)*, No. 3:23-md-03071 (M.D. Tenn Feb. 22, 2024), ECF No. 830.

27.    Faced with a motion to dismiss for lack of personal jurisdiction, plaintiffs voluntarily dismissed the claims against Windsor in the *Kabisch* case on January 31, 2024. Notice

18

of Voluntary Dismissal, *Kabisch v. RealPage. Inc., et al.* No. 3:23-cv-000742 (M.D. Tenn. Jan. 31, 2024), ECF No. 126.

28.     The only active case in the Underlying Litigation in which Windsor remains a defendant is *Haynes*.

29.     The Underlying Litigation alleges wrongful acts by Windsor and asserts causes of actions based on alleged violations of antitrust law.

30.     The Insureds timely reported the Underlying Litigation to Chubb, Argonaut, and Zurich pursuant to the terms and conditions of the Primary Policy and Excess Policies.

**C.     Even Though Chubb Recognized It Has a Coverage Obligation, the Excess Insurers Surreptitiously Coordinated to Avoid Their Coverage Obligations.**

31.     At first, on January 23, 2023, Chubb responded and initially challenged coverage based on the Professional Services Exclusion in the Primary Policy.

32.     The Professional Services Exclusion provides as follows:

> The Company shall not be liable for **Loss** on account of any **Claim** under this Coverage Part: . . . (J) based upon, arising from, or in consequence of performing or the failure to perform any professional service; provided this Exclusion III. (J) shall not apply to any **Claim** brought by on or on behalf of a securityholder of the **Organization** in his or her capacity as such.

33.     The term "professional services" is not defined in the Primary Policy or the Excess Policies.

34.     Chubb is responsible for the language of the Professional Services Exclusion.

35.     The language of the Professional Services Exclusion was drafted by Chubb, not the Insureds.

36.     The Professional Services Exclusion is part of Chubb's policy form, over which Chubb claims a copyright.

37.     Professional services exclusions generally are intended to bar coverage for professional liability claims.  One reason for excluding professional liability claims under D&O

insurance policies is that professional liability claims are intended to be covered under professional liability insurance policies.

38.     On October 27, 2023, counsel for the Insureds responded to Chubb setting forth the various reasons and authority from Massachusetts and Delaware as to why the Professional Services Exclusion was inapplicable to the Underlying Litigation.  **See Exhibit I.**

39.     After reviewing the legal authority and arguments included in Counterclaim Plaintiff's October 27, 2023 letter, on November 15, 2023, Chubb issued a new letter in which it withdrew any denial based on the Professional Services Exclusion and agreed to provide coverage for the Underlying Litigation, subject to a reservation of rights. As part of that letter, Chubb agreed to advance defense costs incurred by Windsor in the Underlying Litigation.  **See Exhibit J.**

40.     Prior to filing this lawsuit, the Excess Insurers were aware that Chubb had agreed to provide coverage for the Underlying Litigation under the Primary Policy.

41.     For more than a year after receiving notice of the Underlying Litigation, the Excess Insurers provided no coverage position with respect to the Underlying Litigation.

42.     Upon information and belief, upon learning of Chubb's agreement to provide coverage for the Underlying Litigation, the Excess Insurers surreptitiously coordinated and engaged in communications to deny coverage for the Underlying Litigation, without the knowledge or consent of their Insureds.

43.     On or about April 15, 2024, without any prior correspondence or notice to the Insureds, the Excess Insurers filed this declaratory judgment action, seeking a declaration that they owe no coverage for the Underlying Litigation based on the Professional Services Exclusion.

44.     While the Excess Insurers falsely stated in their Complaint that they issued the denial letter on April 15, 2024, it was only after filing the declaratory judgment action and not until April 17, 2024, that the Excess Insurers sent correspondence to the Insureds' counsel, denying coverage. A true and correct copy of the April 17, 2024 correspondence is attached as **Exhibit K**.

45.     In their original Complaint, the Excess Insurers also falsely alleged that "[t]he broker for [GIAC] has refused to provide the Plaintiffs a copy of the Chubb Jan. 2023 Letter, the

[GIAC] Letter, and additional correspondence between Chubb and [GIAC]." In truth, upon information and belief, neither the Broker nor the Insureds refused any requests.

46.     Upon information and belief, the Excess Insurers deliberately concealed their intentions from the Insureds, lulling them into believing that they were acting in good faith and that coverage would be provided, only to suddenly change course and file the declaratory judgment action without warning.

47.     Upon information and belief, the secret coordination between Excess Insurers was designed to ambush the Insureds with a denial of coverage and to prevent them from having any meaningful opportunity to respond to the Excess Insurers' position or to seek a resolution before the filing of the declaratory judgment action.

48.     The actions of Excess Insurers in secretly coordinating and filing the declaratory judgment action without prior notice, and only subsequently denying coverage, were undertaken in bad faith and with the intention of harming the Insureds' interests.

49.     The Excess Insurers' assertion of the Professional Services Exclusion to deny coverage is contrary to well-established case law in Massachusetts, Delaware, and elsewhere, which has consistently held that the undefined term "professional services" in similar exclusions must be narrowly construed and that any ambiguity must be resolved in favor of coverage for the insured.

50.     The Underlying Litigation does not contain any professional liability claims.

51.     The Underlying Litigation does not allege any "professional services" by Windsor. Indeed, the only instance in which the 757-paragraph second amended complaint alleges specific conduct by Windsor is in paragraphs 187-88. These paragraphs (incorrectly) allege that Windsor is an "Owner-Operator" in multiple submarkets and that, as part of a "conspiracy," "Windsor entered into a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its more than 86,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow

Defendant Windsor to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices." **Exhibit D** ¶¶ 187-188. In addition to the fact that these allegation contain several important inaccuracies, these allegations do not refer to any "services" performed by Windsor, let alone "professional services." In all other instances in the complaint, Windsor is grouped as one of several "Owner-Operators," and the Underlying Litigation does not allege any services by the Owner-Operators – professional or otherwise.

52. In addition, for the Professional Services Exclusion to apply, the exclusion requires not only that the Underlying Litigation allege professional services, but that there be a causal connection between the claims in the Underlying Litigation and professional services that Windsor performed or failed to perform. There is no such causal link alleged in the Underlying Litigation. The named plaintiffs in the Underlying Litigation do not complain about apartments leased from Windsor or any decisions that Windsor performed as services to its lessees or others.

53. The claimants in the Underlying Litigation do not claim to be recipients of professional services provided by Windsor and are not seeking damages based on Windsor's performance of, or failure to perform, professional services for them.  The Underlying Litigation does not involve a service recipient alleging deficiencies based on the performance of professional services.

54. At the time the Excess Insurers sold the Policies, they were aware of existing case law holding that use of the undefined term "professional services" in professional services exclusions can be ambiguous and subject to multiple reasonable interpretations. Despite this knowledge, both Zurich and Argonaut chose to follow the Professional Services Exclusion without further clarification or modification.

55. The Excess Insurers have the ability to add broad antitrust exclusions to their insurance policies. The Excess Insurers, however, chose not to add such language to the Excess Policies sold to the Insureds.

56. The Excess Insurers' assertion of the Professional Services Exclusion is inconsistent with positions they have taken in other courts. In other insurance coverage disputes,

both Zurich and Argonaut have taken narrow and restrictive positions regarding what constitutes "professional services" in the context of professional liability insurance policies. *See, e.g.*, *Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab.*, 529 F.3d 916, 919 (10th Cir. 2008); *Am. Zurich Ins. Co. v. Doherty*, No. 1:05CV866 (JCC), 2006 WL 1391425, at *2 (E.D. Va. May 19, 2006) ("Zurich Insurance states that the billing practices that resulted in the underlying litigation do not classify as "professional services" under the policy and are therefore not covered"); *Danyo v. Argonaut Ins. Companies*, 318 Pa. Super. 28, 31, 464 A.2d 501, 502 (1983) (noting Argonaut's argument that doctor's services in failure to prepare reports and testimony in court were not "professional services" under the policy).

57.     For example, in *Certain Underwriters at Lloyd's London v. Health Care Management Partners*, Zurich argued that, "[t]o be considered a 'professional service' for insurance purposes, a liability must arise out of the special risks inherent in the practice of the profession. A professional obviously performs many tasks that do not constitute professional services. . . . To be covered, the liability must arise out of the special risks inherent in the practice of the profession." Zurich argued that that standard was not satisfied because "false billings do not 'arise out of the special risks inherent in the practice of [a] profession.'" *Certain Underwriters at Lloyd's London v. Health Care Management Partners*, Civil Action No. 05-CV-00373-RPM-PAC, 2006 WL 822601 (D. Colo. Feb. 24, 2006). A true and correct copy of Zurich's brief is attached as **Exhibit L**.

58.     In a separate brief, Zurich cited case law for the proposition that "The term 'professional' ... means something more than mere proficiency in the performance of a task and implies intellectual skill. A 'professional' act or service is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." *Certain Underwriters at Lloyd's London v. Health Care Management Partners*, Civil Action No. 05-CV-00373-RPM-PAC, 2006 WL 396348, at 23 n. 5 (D. Colo. Jan. 30, 2006). Zurich argued that "[w]hile billing may be an incidental part of an insured's business, it is not a separate professional

service" and that "[c]learly 'billing' falls outside the scope of 'professional' services." *Id.* at \*23 n. 5, 24. A true and correct copy of Zurich's brief is attached as **Exhibit M**.

59.     Zurich made this same argument on appeal to the United States Court of Appeals for the Tenth Circuit. A true and correct copy of this brief is attached as **Exhibit N**.

60.     As another example, Argonaut's affiliate Colony Insurance Company argued that allegations relating to an alleged price-fixing conspiracy did not constitute professional services. *Colony Ins. Co. v. Exert Group International Inc.*, No. 1:15-CV-02499-RPM., 2016 WL 11523264, at \*9-10 (D. Colo. Nov. 9, 2016).  Colony Insurance provided the following illustration:

> As an analogy, assume an attorney practices criminal law and has professional liability insurance to protect him from mistakes made in his practice. Assume further that the attorney entered into a price fixing agreement with other criminal law attorneys in town, so that all attorneys would be guaranteed to receive an agreed upon minimum hourly rate. If one of the attorney's clients discovers the illegal fee arrangement and brings suit alleging damages as a result of that arrangement, the fact that the attorney *normally* provides professional services, *i.e.*, provides advice and representation on criminal matters, would obviously be irrelevant to determining whether the attorney's insurer would have a duty to defend the price-fixing lawsuit. That is because the attorney is not being sued for errors the attorney made in advising and representing a client on a criminal matter, but rather for conduct outside of the professional services. Evidence submitted regarding the professional services the attorney normally performs would have no bearing whatsoever on the duty to defend issue. The Insureds in the case at bar miss that distinction, or seek to hide from it.

A true and correct copy of Colony Insurance Co.'s brief is attached as **Exhibit O**.

61.     In another brief in the same case, Colony Insurance Co. cited a case for the proposition that "professional services" has been construed to mean "services rendered by a recognized professional in the fields of medicine, law, accounting, or architecture. Such professionals are distinguished by specialized training or education, state licenses, and legal liability for professional negligence or malpractice." *Colony Ins. Co. v. Exert Group International Inc.*, No. 1:15-CV-02499-RPM., 2016 WL 11523263, at \*30 n.5 (D. Colo. Sept. 15, 2016) (citing

*CDL, Inc. v. Certain Underwriters at Lloyds London*, Nos. 3004 EDA 2013, 2860 EDA 2013, 2014 WL 10914098 (Pa. Super. Ct. July 22, 2014)). A true and correct copy of Colony Insurance Co.'s brief is attached as **Exhibit P**.

62.     In another case, in *Colony Insurance Company v. Fladseth*, Argonaut's affiliate Colony Insurance Company argued, citing Massachusetts law, that "unless a specific malpractice policy defines the term otherwise, 'professional services' do not include the business or administrative aspects of the profession." *Colony Insurance Company v. Fladseth*, No. 12-cv-01157, at *16 of 18 (N.D. Cal. Sept. 12, 2012). Citing case law from the United States Court of Appeals for the First Circuit, Colony Insurance Co. argued "[b]illing practices are simply not considered by the courts to constitute a 'professional service.'" *Id.* at *14 of 18 (citing *Medical Records Assoc., Inc. v. American Empire Surplus Lines Ins. Co.*, 142 F.3d 512 (1st Cir. 1998)). A true and correct copy of Colony Insurance Co.'s brief is attached as **Exhibit Q**.

63.     The Excess Insurers' current broad interpretation of "professional services" in the context of the Professional Services Exclusion is inconsistent with their previous positions and demonstrates a self-serving and unprincipled approach to policy interpretation.

64.      At a minimum, the Professional Services Exclusion is ambiguous and it must be interpreted in favor of coverage thereby requiring the Excess Insurers to provide coverage, including advancement of defense costs, upon the exhaustion of the Primary Policy. Indeed, the fact that the Excess Insurers have taken inconsistent positions from case to case shows that, at a minimum, the Insureds' construction of the Professional Services Exclusion is a reasonable one.

65.     The reasonableness of the Insureds' construction of the Professional Services Exclusion is further supported by the fact that Chubb, which drafted the Professional Services Exclusion, has agreed to provide defense coverage for the Underlying Litigation.

66.     The Excess Policies follow form to the Primary Policy, and the Excess Insurers' assertion of the Professional Services Exclusion is not based on any unique language or endorsements in the Excess Policies. As the Excess Policies follow form to the Primary Policy,

Chubb's decision to provide defense coverage and withdraw reliance on the Professional Services Exclusion as a bar to coverage should have been given significant weight by the Excess Insurers.

67.     By taking a contrary position on the applicability of the Professional Services Exclusion, the Excess Insurers have acted in a manner inconsistent with the nature and purpose of follow-form excess coverage, which is intended is to ensure continuity and consistency in the protection afforded to insureds across all layers of insurance.

68.     The actions of the Excess Insurers are contrary to the Insureds' reasonable expectations in purchasing follow-form excess coverage.

69.     Further, upon information and belief, the Excess Insurers have engaged in a deceptive business practice of demanding the primary insurer's coverage position but then selectively adhering to the primary insurer's coverage determinations to serve its own interests. Specifically, upon information and belief, the Excess Insurers have followed the primary insurer's coverage position when it results in a denial of coverage, but disregarded the primary insurer's coverage position when it results in the recognition of coverage.

70.     Even as the Excess Insurers have asserted the Professional Services Exclusion to deny coverage, the Excess Insurers have never provided a coverage position with respect to the Professional Liability Coverage of the Primary Policy to which the Excess Policies also follow form.

71.     The Insureds have been prejudiced by the actions of Excess Insurers, as the Insureds have been forced to incur substantial costs and expenses in defending against the declaratory judgment action and have been deprived of the coverage to which they are entitled under the Excess Policies.

72.     The Excess Insurers' actions constitute a breach of their contractual obligations and violate Massachusetts General Law Chapter 93A, entitling the Insureds to compensatory and multiplied damages, as well as attorneys' fees and costs.

**CAUSES OF ACTION**

**COUNT I**

**(Declaratory Judgment – Coverage Upon Exhaustion)**

73.     The Insureds incorporate by reference each of the allegations in paragraphs 1 through 72 into Count I.

74.     The Excess Policies are valid, enforceable contracts.

75.     The Insureds have complied with all applicable terms and conditions of the Excess Policies and have paid all required premiums.

76.     Under the Excess Policies, upon attachment, the Excess Insurers contractually agreed to provide coverage, including the advancement of defense costs, to the Insureds.

77.     The Underlying Litigation contains claims against Windsor that fall, or potentially fall, within the coverage of the Excess Policies.

78.     Under the terms of the Excess Policies, upon attachment, the Excess Insurers have a coverage obligation, including the obligation to advance defense costs in the Underlying Litigation.

79.     The Excess Insurers have denied any coverage obligation for the Underlying Litigation, including any obligation to advance defense costs, based on the Professional Services Exclusion.

80.     The Insureds contend that the Professional Services Exclusion does not apply to the claims in the Underlying Litigation and that the Excess Insurers' denial of coverage based on this exclusion is improper.

81.     Accordingly, pursuant to 28 U.S.C. § 2201, there is an actual and justiciable controversy concerning whether the Excess Insurers have a coverage obligation for the Underlying Litigation and whether the Professional Services Exclusion bars coverage for the claims in the Underlying Litigation. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. A declaratory judgment is necessary and appropriate to resolve this controversy and to determine the rights and obligations of the parties under the Excess Policies.

82.     The Insureds seek a declaration that (a) the Professional Services Exclusion does not bar coverage for the Underlying Litigation; and (b) upon exhaustion of the underlying limits of liability, the Excess Insurers have an obligation to provide coverage, including the advancement of defense costs, for the Underlying Litigation.

## COUNT II
### (Breach of Contract)

83.     The Insureds incorporate by reference each of the allegations in paragraphs 1 through 72 into Count II.

84.     The Excess Policies are valid, enforceable contracts.

85.     The Insureds have complied with all applicable terms and conditions of the Excess Policies and have paid all required premiums.

86.     Under the Excess Policies, the Excess Insurers contractually agreed to provide coverage, including the advancement of defense costs, to the Insureds.

87.     The Underlying Litigation contains claims against Windsor that fall, or potentially fall, within the coverage of the Excess Policies.

88.     Under the terms of the Excess Policies, upon attachment, the Excess Insurers have a coverage obligation for the Underlying Litigation, including the obligation to advance defense costs incurred by Windsor in the Underlying Litigation.

89.     The Excess Insurers have unequivocally denied coverage, including any defense obligation, for the Underlying Litigation based on the Professional Services Exclusion.

90.     By doing so, the Excess Insurers have anticipatorily breached their contractual obligations under the excess insurance policies.

91.     The Insureds have suffered, and continue to suffer, damages because of Excess Insurers' breach.

28

## COUNT III

## (Violation of Massachusetts General Laws Chapter 176D and Chapter 93A)

92.    The Insureds incorporate by reference each of the allegations in paragraphs 1 through 72 into Count III.

93.    At all times relevant here, the Insureds were engaged in the conduct of trade or commerce within the Commonwealth of Massachusetts.

94.    At all times relevant here, the Excess Insurers were engaged in the conduct of trade or commerce within the Commonwealth of Massachusetts.

95.    In knowingly disregarding their duty to provide defense coverage and anticipatorily breaching their obligations under the Excess Policies, the Excess Insurers engaged in "unfair claims settlement" and clear violations of Massachusetts General Laws, Chapter 176D § 3(9), which thereby constitute violations of Massachusetts General Laws, Chapter 93A.

96.    The Excess Insurers' unfair or deceptive acts and practices include, without limitation:

    i.    Failing to acknowledge and respond reasonably promptly to claims under the Excess Policies regarding the Underlying Litigation;

    ii.    Failing to affirm or deny coverage of the Insureds' claims within a reasonable time after the Insureds reported the Underlying Litigation;

    iii.    Coordinating, without the Insureds' knowledge or consent, in conspiring to wrongfully deny coverage under the Excess Policies;

    iv.    Filing their complaint in this lawsuit before providing the Insureds with a coverage position;

    v.    Forcing the Insureds to initiate litigation to establish their rights under the Excess Policies;

    vi.    Failing to adopt and implement reasonable standards for the prompt investigation of claims under the Excess Policies;

vii. Misrepresenting the benefits, advantages, conditions, or terms of the Excess Policies;

viii. Failing to provide promptly a reasonable explanation of the basis for denying coverage for the Underlying Litigation;

ix. Refusing to provide coverage for the Underlying Litigation without conducting a reasonable investigation based on all available information;

x. Misrepresenting pertinent facts or provisions of the Primary Policy and Excess Policies related to the coverages at issue;

xi. Raising an improper defense based on the Professional Services Exclusion and doing so more than a year after the Insureds first submitted claims;

xii. Asserting a construction of the Professional Services Exclusion that they know to be contrary to Massachusetts case law and cases from other states, as set forth in Paragraphs 54 and 56 through 62 above;

xiii. Taking inconsistent positions regarding the interpretation and meaning of "professional services" in other cases, as set forth in Paragraphs 56 through 62 above; and

xiv. Doing (or failing to do) all the above with respect to the Insureds' coverage under the Excess Policies.

97.    In addition to the foregoing specific breaches of statutory duties set forth in Massachusetts General Laws, Chapter 176D, the Excess Insurers' conduct as alleged in these Counterclaims and which will be proven through discovery and trial, constitutes unfair and deceptive acts and practices in the conduct of trade or commerce in violation of Massachusetts General Laws, Chapter 93A § 2 and actionable under § 11.

98.    Upon information and belief, the actions of Excess Insurers were knowing and willful and were not isolated or accidental, but rather part of a larger pattern and practice of bad-faith conduct aimed at avoiding their obligations under the Excess Policies.

99.    The Excess Insurers knew or should have known that their actions would cause substantial harm to the Insureds, depriving the Insureds of the coverage to which they were entitled and forcing the Insureds to incur significant expenses in defending against the declaratory judgment action.

100.    The Excess Insurers' unfair and deceptive acts and practices at issue took place and continue to take place primarily and substantially within the Commonwealth of Massachusetts and have resulted in harm to the Insureds.

101.    As a result of its unfair and deceptive acts and practices in violation of Massachusetts General Laws Ch. 93A, §11, the Excess Insurers are liable to the Insureds for double or treble actual damages and attorneys' fees incurred by the Insureds in this action.

### PRAYER FOR RELIEF

WHEREFORE, the Insureds pray for relief as follows:

(i)    Judgment on Count I of this Counterclaim declaring that (a) the Professional Services Exclusion does not bar coverage for the Underlying Litigation; and (b) the Excess Insurers have an obligation to provide coverage, including the advancement of defense costs, for the Underlying Litigation upon exhaustion of the underlying limits of liability.

(ii)    Judgment on Count II of this Counterclaim in favor of Insureds and against the Excess Insurers and awarding damages in an amount to be proven;

(iii)    Judgment on Count III of this Counterclaim in favor of Insureds and against the Excess Insurers and awarding the Insureds compensatory damages, consequential damages, and any other pertinent damages in an amount not less than two nor greater than three times the amount of the actual damages, along with attorneys' fees, costs, and pre- and post-judgment interest;

(iv)    Attorneys' fees and costs;

(v)    Pre- and post-judgment interest; and

(vi)    For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the Insureds demand a trial by jury on all issues triable by a jury.

Dated: May 16, 2024

Respectfully submitted,

*/s/ Andrew M. Reidy*
Andrew M. Reidy (BBO 550808)
NOSSAMAN LLP
1401 New York Avenue NW
Suite 800
Washington, D.C. 20005
Telephone: (202) 887-1412
areidy@nossaman.com

*Counsel for Defendants/Counterclaim Plaintiffs*

*Of Counsel:*

Joseph M. Saka (pro hac vice motion to be filed)
Scott Boyle (pro hac vice motion to be filed)
Nossaman LLP
1401 New York Avenue, NW
Suite 800
Washington, DC 20005
Telephone:  (202) 887-1400
jsaka@nossaman.com
sboyle@nossaman.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 16, 2024.


*/s/ Andrew M. Reidy*