## THE UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARGONAUT INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> v. <br><br> GID INVESTMENT ADVISERS CORPORATION, WINDSOR PROPERTY MANAGEMENT COMPANY, <br><br> Defendants. | Case No.: 1:24-cv-10971-RGS |

### DEFENDANT / COUNTER-PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS

Defendants and Counter-Plaintiffs GID Investment Advisers Corporation ("GIAC") and Windsor Property Management Company ("Windsor") (collectively, the "Windsor Insureds") submit this Memorandum in Support of their Motion for Partial Judgment on the Pleadings Against Plaintiffs and Counter-Defendants Argonaut Insurance Company ("Argonaut") and Zurich American Insurance Company ("Zurich") (collectively, the "Excess Insurers").

The Excess Insurers sold excess directors and officers ("D&O") insurance policies to the Windsor Insureds that follow form to the terms and conditions of a primary D&O insurance policy (the "Primary Chubb Policy") sold by Federal Insurance Company ("Chubb"). The policies provide coverage, including the advancement of defense costs, for claims alleging broadly defined "Wrongful Acts." During the policy period, Windsor was named in multidistrict litigation alleging that Windsor and more than fifty other named defendants conspired to fix prices of rental units in

multi-family apartment buildings (the "Underlying Litigation").  The primary insurer Chubb has agreed to advance Windsor's defense costs subject to a reservation of rights.  The Excess Insurers, however, have denied any coverage obligation for the Underlying Litigation on the basis of an exclusion drafted by Chubb and contained in the Primary Chubb Policy, which bars coverage for losses from claims "based upon, arising from, or in consequence of performing or the failure to perform any professional service" (the "Professional Services Exclusion").

As the Excess Insurers have recognized, Massachusetts courts apply a stringent standard in determining if activities constitute "professional services," requiring that services be based on specialized knowledge, training, or experience.  The Underlying Litigation is devoid of any such allegations.  While the Excess Insurers have suggested that the setting of prices for residential units constitutes a "professional service," these activities do not require any specialized training or learning.  Indeed, the allegations in the Underlying Litigation focus on the defendants' common use of software sold by RealPage and that pricing decisions were allegedly delegated to the software program.  In any event, there is no causal connection between the claims and Windsor's performance of or failure to perform professional services.  The Underlying Litigation does not allege any form of malpractice or professional negligence.  The claims are not contingent on a showing that Windsor performed or failed to perform any services – professional or otherwise, but on proof that Windsor, among other things, reached an agreement with competitors to fix prices.

The Excess Insurers sold D&O insurance to companies in the residential real estate business, yet now propose a construction of the Professional Services Exclusion that would defeat the main purpose of the D&O coverage.  Under the Excess Insurers' proposed construction, the D&O insurance would not extend to some of the most basic activities of a residential real estate company, including the leasing, maintenance, collections, and pricing of apartment units.  To the extent that the Excess Insurers did not intend to cover antitrust claims, they have available express antitrust exclusions that would have accomplished that goal.  But they chose to follow a primary policy that does not contain such an exclusion, and without adding one to their policies.

At a minimum, the Professional Services Exclusion is ambiguous with respect to its applicability to the Underlying Litigation.  This is evidenced by the fact that Chubb, which drafted the language in the Professional Services Exclusion, has recognized it has an obligation to advance defense costs.  Moreover, when the Excess Insurers sold the policies, they were aware of Massachusetts case law noting that the undefined term "professional services" is ambiguous, but nonetheless chose not to refine that term.  Perhaps most telling, when it has suited their interest in other cases, the Excess Insurers have taken a narrow view as to what activities constitute "professional services."  Thus, the Windsor Insureds have offered a reasonable construction of the Professional Services Exclusion, if not the only one, and the policy language must be construed in favor of coverage.

Therefore, the Windsor Insureds respectfully request that the Court grant partial judgment that (1) the Professional Services Exclusion does not relieve the Excess Insurers of their obligation to provide defense coverage for the Underlying Litigation; (2) payments by Chubb in the Underlying Litigation qualify as Loss under the Primary Chubb Policy and serve to erode limits; (3) upon attachment of their respective policies, the Excess Insurers must advance Windsor's defense costs in the Underlying Litigation; and (4) the Windsor Insureds are entitled to recover the costs and expenses, including reasonable attorneys' fees, incurred in this action to date.

## UNDISPUTED FACTS

### A.    The Excess Insurers Sold Broad Excess D&O Insurance Policies to the Windsor Insureds.

Chubb sold the Asset Management Protector Policy No. 6805-2277 for the Policy Period of October 1, 2022 to October 1, 2023.  Am. Compl. ¶ 13, ECF No. 8.  The Primary Chubb Policy consists of several coverage parts, including a Directors & Officers Liability Coverage Part.  *Id.* The Excess Insurers sold excess insurance policies (the "Excess Policies") sitting above the Primary Chubb Policy, with Argo selling a first-layer excess insurance policy with a limit of $5 million excess to $5 million and Zurich selling a second-layer excess insurance policy with a limit of $5 million excess to $10 million.  Am. Compl. ¶¶ 14–15, ECF No. 8.  Both Excess Policies

3

follow form to the Primary Chubb Policy except where otherwise noted, including the D&O Coverage Part of the Primary Chubb Policy.  Am. Compl. ¶¶ 14–15, ECF No. 8.

The D&O Coverage Part provides that the Insurers would "pay, on behalf of an **Organization, Loss** which such **Organization** becomes legally obligated to pay on account of any **Claim** first made against the **Organization** during the **Policy Period** or, if exercised, during the Extended Reporting Period, for a **Wrongful Act** by the **Organization** before or during the **Policy Period**."  Answer to Counterclaims ¶ 16, ECF No. 23.  Windsor is an "Organization" within the meaning of the coverage.  Answer to Counterclaims ¶ 17, ECF No. 23.  The term "**Wrongful Act,**" is broadly defined to include, among other things, "[a]ny error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted . . . by the **Organization**. . . ."  Answer to Counterclaims ¶ 18, ECF No. 23.  The term "**Loss**" includes "**Defense Costs**," and the Excess Policies require that defense costs "be advanced on a current basis."  Answer to Counterclaims ¶¶ 19–20, ECF No. 23.  Antitrust exclusions are available to broadly bar coverage for antitrust claims, but neither the Primary Chubb Policy nor the Excess Policies contain an antitrust exclusion.  Answer to Counterclaims ¶¶ 19–20, ECF No. 23; Counterclaims Exs. E–G, ECF No. 11.

**B.    The Underlying Litigation Asserts Claims Against Windsor During the Policy Period.**

On or about December 16, 2022, a class action was first initiated against Windsor, among others, in a lawsuit captioned *Zhovmiruk v. RealPage, Inc., et al.,* 2:22-cv-01779 (W.D. Wash.).  Answer to Counterclaims ¶ 25, ECF No. 23.  Windsor was subsequently named in two additional lawsuits, *Kabisch v. RealPage. Inc., et al.* 3:23-cv-000742 (M.D. Tenn. Jul. 24, 2023); and *Haynes v. RealPage, Inc. et. al.,* 1:23-cv-3813 (N.D. Ga. Aug. 25, 2023).  Those cases were referred to the Judicial Panel on Multidistrict Litigation, which transferred all actions to the Middle District of Tennessee to be assigned to Judge Waverly D. Crenshaw, Jr. under the caption *In Re: RealPage, Inc. Rental Software Antitrust Litigation (No. II),* No. 3:23-md-03071 (M.D. Tenn.) ("Underlying Litigation").  Currently, *Haynes* is the only operative complaint naming Windsor as a defendant.

The current master complaint – the Second Amended Complaint – in the Underlying Litigation spans more than 300 pages and contains 757 paragraphs.  The complaint names more than four dozen defendants and categorizes them into four groups of defendants: (1) the RealPage defendants; (2) the Managing Defendants; (3) the Owner-Operators; and (4) the Owners.  In the introduction paragraphs of the complaint, the underlying claimants allege that, "Defendants engaged in a nationwide conspiracy to fix and inflate the price of multifamily rental housing across the country.  Leveraging their control of the multifamily rental housing market from at least January 2016, Defendants allegedly conspired to limit supply and raise multifamily rental housing pricing . . . ."  Am. Compl. Ex. 4, at ¶ 1, ECF No. 8.[1]  The Underlying Litigation alleges that, utilizing an integrated technology platform developed by RealPage, "each Owner, Owner-Operator, and Managing Defendant knew that their competitors had accepted RealPage's invitation to participate in the agreement to fix the price of multifamily rental units, regulate supply, and interfere with the free market across the United States through their receipt of marketing materials, participation in RealPage information sharing events, and knowledge of competitors using RealPage's RMS—and with this information, Defendants accepted RealPage's invitation to participate in the scheme."  Am. Compl. Ex. 4, at ¶ 8, ECF No. 8.  The complaint alleges three "overarching principles of the cartel":

> that (1) all members, who were otherwise horizontal competitors, would share the proprietary data necessary for RealPage's RMS to generate rental price recommendations; (2) all members would delegate their rental price and supply decisions to a common decision maker, RealPage; and (3) knowing that cooperation was essential to the successful operation of the scheme, all members would abide by RealPage's price and supply decisions generated by RMS.

Am. Compl. Ex. 4, at ¶ 6, ECF No. 8.

---

[1] For avoidance of doubt, the Windsor Insureds deny these claims and deny any liability in connection with the Underlying Litigation.

Windsor is grouped as one of the Owner-Operators but, aside from the alleged participation in a conspiracy to use RealPage technology to set prices, there are few allegations about specific conduct by Windsor. Specifically, paragraphs 187–88 (incorrectly) allege that Windsor is an "Owner-Operator" in multiple submarkets and that, as part of a "conspiracy," "Windsor entered into a written contract, paid for, and used at least one RealPage RMS—LRO—to manage some or all of its more than 86,000 multifamily rental units nationwide, knowing that doing so required it to share confidential, competitively sensitive pricing and lease information with its horizontal competitors in order to allow them to adjust their rental prices, and in turn, to allow Defendant Windsor to benefit from its horizontal competitors' sensitive pricing and lease information before it set or adjusted its own rental prices." Am. Compl. Ex. 4, at ¶¶ 187–188, ECF No. 8.[2]

The Underlying Litigation asserts causes of actions based on alleged violations of antitrust law, listing causes of action for price fixing in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and violations of various state antitrust statutes. Am. Compl. Ex. 4, at ¶¶ 701–57, ECF No. 8. The Underlying Litigation does not contain any causes of action for malpractice, negligence, or professional negligence. *See generally* Am. Compl. Ex. 4, ECF No. 8.

C.    **Even Though Chubb Has Agreed to Advance Defense Costs for the Underlying Litigations, the Excess Insurers Have Denied Any Coverage Obligation.**

The Underlying Litigation was first filed against Windsor during the policy period of the Excess Policies, and the Windsor Insureds promptly reported the Underlying Litigation to Chubb, Argonaut, and Zurich during the policy period. Answer to Counterclaims ¶¶ 5, 30, ECF No. 23. Initially, on January 23, 2023, Chubb responded and challenged coverage based on the Professional Services Exclusion, which is part of Chubb's policy form and provides as follows:

---

[2] While the complaint does not refer to any other specific conduct by Windsor, the underlying plaintiffs allege that Owner-Operators advanced the conspiracy by intentionally leaving rental units vacant as a means to raise prices. Am. Compl. Ex. 4, at ¶¶ 31, 33, ECF No. 8. The underlying plaintiffs also allege that leasing agents could not deviate from RealPage's set prices without approval from an internal or external manager and often not with-out "approval from senior management within the Owner-Operator." Am. Compl. Ex. 4, at ¶ 18, ECF No. 8.

6

> The Company shall not be liable for **Loss** on account of any **Claim** under this Coverage Part: . . . (J) based upon, arising from, or in consequence of performing or the failure to perform any professional service; . . . .

Am. Compl. Ex. 1, at 28, ECF No. 8. The term "professional services" is not defined in the policies. *See generally* Am. Compl. Exs. 1–3, ECF No. 8.

On October 27, 2023, counsel for the Windsor Insureds responded to Chubb setting forth the various reasons and authority from Massachusetts as to why the Professional Services Exclusion was inapplicable to the Underlying Litigation. Counterclaims Ex I, ECF No. 11. After reviewing the legal authority and arguments included in the Windsor Insureds' October 27, 2023 letter, on November 15, 2023, Chubb issued a new letter in which it withdrew any denial based on the Professional Services Exclusion and agreed to advance defense costs incurred by Windsor in the Underlying Litigation, subject to a reservation of rights. Counterclaims Ex J, ECF No. 11.

Prior to filing this lawsuit, the Excess Insurers were aware that Chubb had agreed to provide coverage for the Underlying Litigation under the Primary Chubb Policy. Answer to Counterclaims ¶ 40, ECF No. 23. On or about April 15, 2024, the Excess Insurers filed this declaratory judgment action. Compl., ECF No. 1. In their lawsuit, the Excess Insurers assert a single exclusion as a bar to coverage – the same Professional Services Exclusion which Chubb determined did not relieve Chubb of its duty to advance defense costs. Am. Compl. ¶¶ 49–58, ECF No. 8. The Excess Insurers seek a declaratory judgment that the Professional Services Exclusion bars coverage and, therefore, any payment by Chubb under the Primary Chubb Policy does not qualify as a payment of Loss which erodes the Underlying Insurance in the Excess Policies. Am. Compl. ¶¶ 49–62, ECF No. 8. On May 16, 2024, the Windsor Insureds filed their answer with counterclaims, asserting causes of action for (1) declaratory judgment pursuant to 28 U.S.C. § 2201; (2) breach of contract; and (3) violations of Massachusetts General Law Chapter 93A. Counterclaims, ECF No. 11.

This Motion addresses the narrow but critical question of whether the Professional Services Exclusion relieves the Excess Insurers of their duty to advance defense costs. Assuming this Motion is granted, the case would move forward on issues relating to Windsor's damages and the Excess Insurers' liability for violations of Chapter 93A.

## ARGUMENT

**I.    Partial Judgment on the Pleadings Is Appropriate When There Are No Genuine Disputes as to Any Material Facts.**

Where there are no factual issues in dispute, a court may resolve a contract interpretation issue on a motion for judgment on the pleadings. *SPARTA Ins. Co. v. Pennsylvania Gen. Ins. Co.*, 651 F. Supp. 3d 391, 399 (D. Mass. 2023).  Motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) "implicate[] the pleadings as a whole" and are ordinarily considered under the same standard as motions to dismiss under Rule 12(b)(6). *Aponte-Torres v. Univ. Of Puerto Rico*, 445 F.3d 50, 54–55 (1st Cir. 2006).  Judgment on the pleadings is warranted where the "uncontested and properly considered facts" allow for no plausible possibility that the nonmovant will prevail and therefore establish that the movant is entitled to a favorable judgment. *Great Lakes Ins. SE v. Andersson*, 66 F.4th 20, 25 (1st Cir. 2023).  In applying this standard, courts take all well-pleaded and uncontested facts as true. *Kando v. Rhode Island State Bd. Of Elections*, 880 F.3d 53, 58 (1st Cir. 2018). "In addition to well-pleaded facts, a court may consider documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *SPARTA Ins. Co.*, 651 F. Supp. 3d at 397; *Kando*, 880 F.3d at 58.[3]

Because there are no disputed issues of material fact with respect to the question of whether the Insurers have a defense obligation for the Underlying Litigation, a ruling on this issue is ripe for early resolution by judgment on the pleadings.

**II.    The Insurers Have a Defense Obligation Under the Excess Policies if There Is any Potential for Coverage for any Allegations in the Underlying Litigation.**

Under Massachusetts law, an insurer has a defense obligation and duty to advance defense costs when the allegations in an underlying lawsuit "are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms." *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.3d 399, 403 (1st Cir. 2009); *Welch Foods, Inc. v. Nat'l Union Fire Ins. Co.*,

---

[3] To the extent the Court is required to review any materials outside of the pleadings, summary judgment would be appropriate.

No. CIV A. 09-12087, 2010 WL 3928704, at *1 (D. Mass. Oct. 1, 2010), *aff'd sub nom. Welch Foods, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 659 F.3d 191, (1st Cir. 2011).  To determine whether this is the case, the court need only compare the allegations in the underlying complaint with the terms of the policy and ask whether any of the kinds of losses which would materialize if the allegations were proven are also the kinds of losses which would be covered by the policy.  *BloomSouth Flooring Corp.*, 562 F.3d at 403–04 (quoting *Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co.*, 406 Mass. 7, 545 N.E.2d 1156, 1158–59 (1989)). Unlike the duty to indemnify, the insurer's defense obligation merely requires a showing that the complaint contains allegations that create a potential for coverage and is not dependent on what facts the underlying claimants ultimately prove. *Id.*

The Excess Policies require the Excess Insurers to provide coverage for "Losses" resulting from "Claims" for "Wrongful Acts." Am. Compl. Ex. 1, at ¶ 25, ECF No. 8.  These requirements are satisfied. The Underlying Litigation constitutes a "Claim" insomuch as it is a "civil proceeding commenced by service of a complaint."  The Underlying Litigation alleges "Wrongful Acts" insomuch as it alleges that Windsor engaged in "acts," "omissions," or "breaches of duty" that violate state and federal antitrust laws.  And Windsor has incurred "Losses" within the meaning of the policies as it has incurred substantial Defense Costs in its defense of the Underlying Litigation.

As such, the Underlying Litigation falls within the scope of the D&O Insuring Agreement in the Primary Chubb Policy.  Unless an exclusion applies, the Excess Insurers have a duty to advance defense costs upon the attachment of their respective Excess Policies.

**III.    The Professional Services Exclusion Does Not Relieve the Insurers of Their Obligation to Advance Defense Costs as a Matter of Law.**

    **A.    The Excess Insurers Bear a High Burden of Proving the Applicability of the Professional Services Exclusion.**

Once a covered risk is established, "the burden shifts to the insurer to prove the applicability of any exclusion to coverage set forth outside of the insuring clause." *Camp Dresser*

*& McKee, Inc. v. Home Ins. Co.*, 30 Mass. App. Ct. 318, 321, 568 N.E.2d 631, 633 (1991); *see also Scottsdale Ins. Co. v. Byrne*, 913 F.3d 221, 228 n.6 (1st Cir. 2019).

Interpretation of the language of the exclusion presents a question of law. *Scottsdale*, 913 F.3d at 228. When interpreting an insurance contract, the starting point is the "fair and reasonable meaning" of the language of the exclusion. *Camp Dresser*, 30 Mass. App. Ct. 318, 323–24, 568 N.E.2d at 635. In undertaking this assessment, Massachusetts courts consider "whether the insured would have reasonably understood the exclusion to bar coverage" in the case at hand. *Scottsdale*, 913 F.3d at 229; *GRE Ins. Grp. v. Metro. Bos. Hous. P'ship, Inc.*, 61 F.3d at 81, 83 (1st Cir. 1995).

Exclusions to coverage "must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured." *Camp Dresser*, 30 Mass. App. Ct. at 324, 568 N.E.2d at 635. Courts should avoid interpretations that would allow the exclusion to "swallow the policy." *See id.* Moreover, any ambiguities in the policy language must be resolved against the insurer. *Id.*; *see also Jefferson Ins. Co. of New York v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 42 Mass. App. Ct. 94, 97–98, 677 N.E.2d 225, 228 (1997). As a matter of law, the Excess Insurers cannot meet their burden of proving that the Professional Services Exclusion bars defense coverage for the Underlying Litigation.

**B.    The Underlying Litigation Does Not Allege That Windsor Engaged In Any "Professional Services."**

**1.    Massachusetts Courts Narrowly Construe the Term "Professional Services."**

A threshold requirement in the Professional Services Exclusion is that a Claim must assert "professional services," an undefined term. The Excess Insurers' burden of proving the Professional Services Exclusion is heightened based on Massachusetts precedent on similar language. The starting point is analyzing "whether the relevant activity was 'professional' in nature." *GRE Ins. Grp. v. Metro. Bos. Hous. P'ship, Inc.*, 61 F.3d 79, 84 (1st Cir. 1995). Massachusetts courts have explained that for an act or service to be considered a "professional service," "[s]omething more than an act flowing from mere employment or vocation is essential."

*GRE*, 61 F.3d at 84 (quoting *Roe v. Fed. Ins. Co.*, 412 Mass. 43, 48, 587 N.E.2d 214, 217 (1992). Instead, "the act or service must be such as exacts the use or application of special learning or attainments of some kind." *Id.* (quoting *Roe*, 412 Mass. at 48). A "professional" act or service must involve a "vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill." *Id.* (quoting *Roe*, 412 Mass. at 48). "The setting for the intellectual training is often an academic one, as in architectural school, engineering school, law school, or medical school." *Reliance Nat. Ins. Co. v. Sears, Roebuck & Co.*, 58 Mass. App. Ct. 645, 648, 792 N.E.2d 145, 148 (2003). Moreover, Massachusetts courts have explained that, while a person may be classified as a "professional" due to their specialized training, not every act of a professional is a professional act or service. *Roe*, 412 Mass. at 48–49. Rather, a professional act or service is only one which requires the application of that special learning. *Id.*

Based on this interpretation of "professional services," Massachusetts courts have narrowly construed which activities and services constitute "professional services." Thus, in *GRE*, the First Circuit held that a professional services exclusion did not relieve an insurer of its defense obligation for a lawsuit against an insured housing organization named in a lawsuit alleging injury from lead exposure at housing it subsidized. 61 F.3d at 84. The First Circuit emphasized that the "term 'professional' in the context used in the policy provision means something more than mere proficiency in the performance of a task." *Id.* (quoting *Roe*, 412 Mass. at 48–49). The First Circuit stated that the allegations in the underlying lawsuit were not limited to allegations relating to professional services and encompassed various aspects of the insured's business that were not professional in nature. *Id.* at 85. Similarly, in *Essex Ins. Co. v. Berkshire Env't Consultants, Inc.*, 99-30280-FHF, 2002 WL 226172, at *1 (D. Mass. Feb. 7, 2002), the Court found that a professional services exclusion did not excuse an insurer's defense obligation for a suit by injured employees of a company that had retained the insured environmental consulting firm to provide consultation services regarding the proper handling of chemicals. The court reasoned that the lawsuit contained allegations about services that were not professional in nature, including relating to management, administrative, clerical, or oversight services. *Id.* at *5.

11

As another example, in *Med. Recs. Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 142 F.3d 512 (1ˢᵗ Cir. 1998), the First Circuit affirmed a ruling by Judge Stearns that overcharging patients and their attorneys for copies of the patients' medical records in violation of medical records regulations did not constitute "professional services," given that the term includes only those aspects of business that require "special learning acquired through considerable rigorous intellectual training." *See also Reliance Nat. Ins. Co.*, 58 Mass. App. Ct. at 648, 792 N.E.2d at 148 (billing for legal services, although inherent to private legal practice, is not a professional service because it "does not draw on special learning acquired through rigorous intellectual training").[4]  These cases highlight the exacting nature required before Massachusetts courts will find an activity to be a professional service.

### 2.    The Excess Insurers Have Previously Recognized the Narrow Meaning of "Professional Services."

At the time they sold the Excess Policies, the Excess Insurers understood that court decisions, including Massachusetts' jurisprudence, mandate a narrow construction of the term "professional services."  For example, in one prior case, Zurich cited case law for the proposition that "[t]he term 'professional' … means something more than mere proficiency in the performance of a task and implies intellectual skill. A 'professional' act or service is one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." *Certain Underwriters at Lloyd's London v. Health Care Management Partners*, Civil Action No. 05-CV-00373-RPM-PAC, 2006 WL 396348, at 23 n. 5 (D. Colo. Jan. 30, 2006).  Similarly, one of Argonaut's affiliates, Colony Insurance Co., cited a case for the proposition that "professional

---

[4] These cases are consistent with decisions from across the United States. *See, e.g., Westchester Gen. Hosp., Inc. v. Evanston Ins. Co.*, 48 F.4th 1298, 1302–03 (11th Cir. 2022) (exclusion did not apply to claim of a patient who was sexually assaulted by employees of the mental health facility because there must be some relationship between the injury and the "performance of acts which fundamentally require a high level of training and proficiency for the benefit of another"); *North Carolina Mut. Wholesale Drug Co. v. Fed. Ins. Co.*, 2023 WL 5312234 (M.D.N.C. Aug. 17, 2023) (sale and distribution of opioids did not constitute "professional services").

services" has been construed to mean "services rendered by a recognized professional in the fields of medicine, law, accounting, or architecture. Such professionals are distinguished by specialized training or education, state licenses, and legal liability for professional negligence or malpractice." *Colony Ins. Co. v. Exert Group International Inc.*, No. 1:15-CV-02499-RPM., 2016 WL 11523263, at \*30 n.5 (D. Colo. Sept. 15, 2016) (Counterclaims Ex. P, ECF No. 11) (citing *CDL, Inc. v. Certain Underwriters at Lloyds London*, Nos. 3004 EDA 2013, 2860 EDA 2013, 2014 WL 10914098 (Pa. Super. Ct. July 22, 2014)).   In another case, citing Massachusetts law, Colony Insurance Company argued that, "unless a specific malpractice policy defines the term otherwise, 'professional services' do not include the business or administrative aspects of the profession." *Colony Insurance Company v. Fladseth*, No. 12-cv-01157, at \*16 of 18 (N.D. Cal. Sept. 12, 2012) (Counterclaims Ex. Q, ECF No. 11).   Thus, the Excess Insurers had recognized that the term "professional services" is construed narrowly by Massachusetts courts.

### 3.    The Underlying Litigation Alleges Sherman Act and Antitrust Violations Without Reference to Any Professional Service.

The Excess Insurers' reliance on the Professional Services Exclusion is misplaced because the Underlying Litigation does not allege any professional services that Windsor provided or failed to provide.   There are no allegations that Windsor provided, or failed to provide, any professional services and, in fact, the claimants include non-residents of Windsor properties.   The Underlying Litigation alleges that defendants conspired to fix prices in violation of federal and state antitrust laws through their common use of software.   Am. Compl. Ex. 4, at ¶¶ 701–57, ECF No. 8.   An alleged conspiracy to fix prices is not a service provided to clients or customers, nor does it require any specialized knowledge, skill, or training, especially when the alleged price fixing was through the common usage of a software program.

The Excess Insurers have been decidedly vague about what professional services they believe to be alleged in the Underlying Litigation.   In their Complaint, the Excess Insurers state that the Underlying Litigation "centers on how Defendants including Windsor utilized RealPage's technology to collude with their competitors to ensure an inflated rental pricing mechanism so that

13

their customers - the renters - will continue to pay higher rates as opposed to competitive rates." Am. Compl. ¶ 56, ECF No. 8.  But, even accepting that incorrect description of the Underlying Litigation as true, such conduct does not involve the provision of professional services.

Even focusing on the more discrete acts of setting prices for apartment units or "utilize[ing] RealPage's technology" to do so, these tasks cannot be considered professional services.  As an initial matter, the Underlying Litigation does not even allege that Windsor made independent pricing decisions; rather the Underlying Litigation alleges that the defendants "delegate[d] their rental price and supply decisions to a common decision maker, RealPage" and then agreed to "abide by RealPage's price and supply decisions generated by RMS."  Am. Compl. Ex. 4, at ¶ 6, ECF No. 8.  The allegations focus on the common use of software as the mechanism to set prices rather than the acts of humans acting in some professional capacity to set prices.  In any event, setting rental prices is a routine business decision made not just by commercial apartment owners, but also by untrained individual property owners across the country.  Setting rental prices requires less technical skill and professional judgment than more complex tasks that Massachusetts courts have found to be short of professional services, such as the day-to-day control and management of a wastewater treatment plant.  *Camp Dresser,* 30 Mass. App. Ct. at 323–25, 568 N.E.2d at 634–35.  Activities such as price setting, billing, collections, and the routine use of pricing software are simply "generic business practices." *See Med. Recs. Assocs.*, 142 F.3d at 515–16.

Every year, thousands of Americans successfully determine prices for their houses, apartments, and rooms and make them available for rent to the public with no educational or licensing requirement.  This ubiquity underscores the non-professional nature of the activity. Apartment price setting does not require specialized education, training, licensure, or knowledge akin to traditional professional services such as those provided by lawyers, doctors, accountants, or engineers.  Because of its ubiquity and lack of barrier to entry, deeming apartment price setting to be a "professional service" would be tantamount to holding that any service provided for a business purpose is a "professional service."  This would render the term to be so broad as to have virtually no meaning and would run contrary to established First Circuit precedent that "the term

14

'professional'…means something more than mere proficiency in the performance of a task" and that professional services include only those aspects of business that require "special learning acquired through considerable rigorous intellectual training." *Med. Recs.*, 142 F.3d at 515–16.

The fact that Windsor allegedly conspired with others to fix prices does not transform the ordinary business function of setting apartment prices, performed by commercial businesses and individuals alike, into a professional service. Therefore, the Excess Insurers, as a matter of law, cannot prove that the Professional Services Exclusion bars coverage for the Underlying Litigation.

### C. The Claims in the Underlying Litigation Are Not "Based Upon, Arising From or in Consequence of" Windsor's Provision of Any Services.

In addition to the fact that the Underlying Litigation does not allege any "professional services" by Windsor, the claims in the Underlying Litigation are not "based upon, arising from, or in consequence of" the performance of any professional services. For the Professional Services Exclusion to apply, it is not enough for a suit to simply contain allegations of "professional services" (which the Underlying Litigation does not). Rather, "[t]here must be a causal relationship between the alleged harm and the complained-of professional act or service…not an act or service that requires no professional skill." *McNulty v. Assurance Co. of Am.*, 81 Mass. App. Ct. 1121, 963 N.E.2d 776 (2012) (unpublished opinion issued pursuant to Mass. R. App. Prac. Reg. 1:28) (quoting *Roe*, 412 Mass. at 49–50) (finding a claim that a physician sexually assaulted a patient did not arise out of any professional services).

In *Jefferson Insurance Co.*, the court found that a professional liability policy did not provide coverage for an ambulance service that drove to the wrong address because, even though the claim related to the provision of professional medical services, the act that claim arose out of was an "ordinary task" (i.e. navigating to an address) that did not require the "exercise of professional judgment." 42 Mass. App. Ct. at 100, 677 N.E.2d at 230; *see also Camp Dresser*, 30 Mass. App. Ct. at 324, 568 N.E.2d at 635 (negligence claims arising out of the general operation and control of a wastewater treatment facility and other "management tasks" did not arise out of professional services, despite being performed by professional engineers).

15

More recently, the Delaware Supreme Court held that a False Claims Act investigation of a mortgage bank for falsely certifying that loans met FHA lending requirements "did not arise out of Guaranteed Rate's professional services. Instead, it arose out of false certifications made to the government." *ACE Am. Ins. Co. v. Guaranteed Rate, Inc.*, 305 A.3d 339, 341, 348–49 (Del. 2023). In so doing, the court recognized that, for a professional services exclusion to apply, it is not enough that the underlying claim would not exist "but for" the insured's performance of professional services or that the alleged wrongful acts are tangentially related to a professional service. *Id.* Instead, there must be a "meaningful linkage" between the professional service and the injury complained of. *Id.*; *see also Peterborough Oil Co. v. Great Am. Ins. Co.*, 397 F. Supp. 2d 230, 238 (D. Mass. 2005) (explaining that the "arising out of" requirement "does not capture all events between which a causal connection may be drawn" but rather that "the term falls somewhere between proximate and 'but for' causation").

At bottom, professional services exclusions are targeted at "malpractice claims." *Rob Levine & Assocs. v. Travelers Cas. & Sur. Co. of Am.,* 994 F. Supp. 2d 228, 233 n.7 (D.R.I. 2014). The Underlying Litigation does not assert accounting, legal, medical, or any other form of professional malpractice or negligence. Rather, the Underlying Litigation alleges there was a conspiracy to fix prices and asserts antitrust claims. These claims do not arise from any deficiency or failure in Windsor's performance of a professional service. Rather, they are based on the alleged collusion with competitors and the use of common software. The claimants in the Underlying Litigation include non-residents of Winsor-properties who received no services from Windsor, professional or otherwise. Simply stated, there is no causal connection between Windsor's performance of any services and the claims in the Underlying Litigation, and the Excess Insurers cannot meet their burden.

**D.    The Construction Urged by the Insurers Would Swallow the D&O Coverage and Would Read Language Into the Policies That the Excess Insurers Omitted.**

Under Massachusetts law, courts avoid interpretations that would allow the exclusion to "swallow the policy." *Camp Dresser*, 30 Mass. App. Ct. at 323, 568 N.E.2d at 634*; see also*

16

*Peterborough Oil Co.*, 397 F. Supp. 2d at 238.  Insurance policy exclusions must be interpreted with an eye toward "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Dorchester Mut. Ins. Co. v. Krusell*, 150 N.E.3d 731, 737–38 (2020); *GRE*, 61 F.3d at 81.

The Excess Insurers sold D&O insurance to a company that is in the residential real estate business and followed form to a primary policy covering "Claims" alleging broadly defined "Wrongful Acts."  Am. Compl. ¶¶ 11–12, 14–15, 54–55, ECF No. 8**.** Nonetheless, the Excess Insurers proffer a construction of the Professional Services Exclusion that would exclude coverage for core activities that are fundamental to managing residential apartment buildings.  Am. Compl. ¶¶ 54–55, ECF No. 8.  The Insurers have repeatedly cited a list of Windsor's responsibilities and competencies from GID's website as support for the notion that Windsor's activities constitute "professional services."  *Id*.  While the website has nothing to do with the Underlying Litigation, in so doing, the insurers highlight the problem with their construction.  The website list, which does not purport to describe "professional services," is broad and lists several of Windsor's core business functions with listed bullets that include "maintenance," "technology," and "integration." Am. Compl. ¶ 54, ECF No. 8. To construe all of these business functions as "professional services" as the term is used in the exclusion would be to exclude most of Windsor's operations from Windsor's coverage. This is apposite to "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *GRE*, 61 F.3d at 81.

A similar assertion was rejected in *Camp Dresser*.  There, the insurer proffered a similarly broad interpretation of a professional services exclusion, arguing that nearly every activity of the professional engineers charged with operating a water treatment plant should be excluded. 30 Mass. App. Ct. at 323, 568 N.E.2d at 634.  The court rejected this construction because "[s]uch an interpretation would have the exclusion swallow the policy."  *Id.*  The Court should do the same here, because classifying generic business functions, like setting of prices, as "professional services" would "defeat any intended coverage or diminish the protection purchased by the

17

insured." *Camp Dresser*, 30 Mass. App. Ct. at 324, 568 N.E.2d at 635; *Rob Levine,* 994 F. Supp. 2d at 233 (declining to construe professional services exclusion to "create such an absurd result").

At the same time, under Massachusetts law, courts are mindful of language that insurance companies could have used but omitted from their policy. *See Green Mountain Ins. Co., Inc. v. Wakelin*, 484 Mass. 222, 233–34, 140 N.E.3d 418, 427 (2020). The Excess Insurers have broad antitrust exclusions that they utilize in connection with their insurance policies (Counterclaims Exs. E–G, ECF No. 11), and they "admit that in other policies . . . antitrust exclusions may be included in policies." Answer to Counterclaims ¶ 24, ECF No. 23. The Primary Chubb Policy contains no such exclusion, and the Excess Insurers chose to follow that policy without adding any such exclusion. The Excess Insurers assumed the risk of covering antitrust claims, and they should not be permitted to turn the Professional Services Exclusion into a *de facto* antitrust exclusion.

### E.    At a Minimum, the Professional Services Exclusion Is Ambiguous.

At a minimum, the Professional Services Exclusion is ambiguous. A policy term or exclusion is ambiguous if it is reasonably susceptible to more than one reasonable interpretation. *Jefferson Ins. Co.*, 42 Mass. App. Ct. at 97, 677 N.E.2d at 228. The Excess Insurers neglected to include a definition of the most important operative term in the exclusion even in the face of their knowledge that courts had construed the undefined term "professional services" to be ambiguous, and they are responsible for any ambiguity. *See id.*

The ambiguity is further underscored by Chubbs's actions. The Professional Services Exclusion is part of Chubb's policy form, and Chubb recognized that the exclusion did not relieve the company of advancing defense costs for the Underlying Litigation. Under Massachusetts law, excess policies generally "should be interpreted consistently with similar language in the underlying policy." *W.R. Grace & Co. v. Hartford Accid. & Indem. Co.,* 407 Mass. 572, 585, 555 N.E.2d 214, 221 (1990). At the very least, Chubb's recognition of its obligation to advance defense costs in the Underlying Litigation shows that Windsor's construction of the Professional Services Exclusion is a reasonable one and is highly probative, if not dispositive, of the Excess Insurers' contractually identical coverage obligations.

18

The term "professional services" also is a double-edged sword for the insurers, as they use the term both in professional services exclusions in D&O policies and as part of insuring agreements in professional liability policies.  In other insurance coverage disputes, both Zurich and Argonaut have taken narrow and restrictive positions regarding what constitutes "professional services," frequently citing Massachusetts cases to do so.  *See above* at page _.  As one glaring example, in arguing that the setting of wages as part of an au pair company's placement services did not constitute "professional services," Colony Insurance provided the following explanation for why an alleged price-fixing conspiracy would not satisfy the "professional services" language:

> [A]ssume an attorney practices criminal law and has professional liability insurance to protect him from mistakes made in his practice. Assume further that the attorney entered into a price fixing agreement with other criminal law attorneys in town, so that all attorneys would be guaranteed to receive an agreed upon minimum hourly rate. If one of the attorney's clients discovers the illegal fee arrangement and brings suit alleging damages as a result of that arrangement, the fact that the attorney *normally* provides professional services, *i.e.*, provides advice and representation on criminal matters, would obviously be irrelevant to determining whether the attorney's insurer would have a duty to defend the price-fixing lawsuit. That is because the attorney is not being sued for errors the attorney made in advising and representing a client on a criminal matter, but rather for conduct outside of the professional services.

Counterclaims Ex. O, ECF No. 11. *See also* Counterclaim Ex. Q, ECF No. 11.

The fact that the Excess Insurers have taken inconsistent positions from case to case shows Windsor's construction of the Professional Services Exclusion is a reasonable one.  *Guaranteed Rate, Inc.*, 305 A.3d 339, 345 (Del. 2023) (citing Chubb's shifting positions).  Resolving all ambiguities in favor of the Windsor Insureds establishes that there is a potential for coverage arising from the Underlying Litigation and that, upon attachment of their respective policies, the Excess Insurers have a defense obligation for, and must advance defense costs for, the Underlying Litigation. *Camp Dresser*, 30 Mass. App. Ct. at 324, 568 N.E.2d at 635.

19

**IV.      The Windsor Insureds are Entitled to Their Reasonable Attorneys' Fees.**

Massachusetts law entitles the Windsor Insureds to recover the costs of defending against the Excess Insurers' declaratory judgment action and of establishing the Excess Insurers' defense obligation. *Preferred Mut. Ins. Co. v. Gamache*, 426 Mass. 93, 96–97, 686 N.E.2d 989, 992 (1997). This well-established rule flows from the principle that allowing an insurer to impose the legal costs of a declaratory judgment action on its insured in order to obtain the benefit of having its underlying defense costs reimbursed would effectively allow the insurer to deprive the insured of the benefit for which it bargained and paid its premiums. *Id.*; *Rubenstein v. Royal Ins. Co. of Am.*, 429 Mass. 355, 358, 708 N.E.2d 639, 642 (1999).  This recovery is available whenever an insured is forced to litigate its insurer's defense obligation, regardless of whether the insurer or the insured files the declaratory judgment action, *Rubenstein*, 429 Mass. at 357–58, 708 N.E.2d at 641–42, whether the insurer's defense obligation was a close question or not one subject to legitimate dispute, *Hanover Ins. Co. v. Golden*, 436 Mass. 584, 586–87, 766 N.E.2d 838, 840 (2002), or whether the insurer acted in good or bad faith, *id.*.  An award of fees is appropriate here to reimburse the Windsor Insureds for their costs in litigating this action.

**CONCLUSION**

For these reasons, the Windsor Insureds respectfully request that the Court grant partial judgment that (1) the Professional Services Exclusion does not relieve the Excess Insurers of their obligation to provide defense coverage for the Underlying Litigation; (2) payments by Chubb in the Underlying Litigation qualify as Loss under the Primary Chubb Policy and serve to erode limits; (3) upon attachment of their respective policies, the Excess Insurers must advance Windsor's defense costs in the Underlying Litigation; and (4) the Windsor Insureds are entitled to recover the costs and expenses, including reasonable attorneys' fees, incurred in this action to date in an amount to be determined.

Dated: July 12, 2024                                    Respectfully submitted,


                                                        */s/ Joseph M. Saka*


20

Andrew M. Reidy (BBO 550808)
Joseph Saka (pro hac vice)
Scott Boyle (pro hac vice)
NOSSAMAN LLP
1401 New York Avenue NW
Suite 800
Washington, D.C. 20005
Telephone: (202) 887-1412
areidy@nossaman.com
jsaka@nossaman.com
sboyle@nossaman.com

***Counsel for Defendants/Counter-Plaintiffs***

21

22

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on July 12, 2024.

*/s/ Joseph Saka*