**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

ARGONAUT INSURANCE COMPANY,
ZURICH AMERICAN INSURANCE COMPANY

                   Plaintiffs,

     v.

GID INVESTMENT ADVISERS CORPORATION,
WINDSOR PROPERTY MANAGEMENT
COMPANY

                   Defendants.

Case No. 1:24-cv-10971-RGS

------------------------------------------------------------------------

**PLAINTIFFS / COUNTERCLAIM DEFENDANTS' MEMORANDUM IN OPPOSITION TO DEFENDANTS / COUNTERCLAIM PLAINTIFFS' MOTION FOR PARTIAL <u>JUDGMENT ON THE PLEADINGS</u>**

4887-1628-9752.1

**TABLE OF CONTENTS**

<b>Page</b>

I.     INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................. 3

     A.    Policies ................................................................................................ 3

     B.    The Underlying Litigation ................................................................... 4

     C.    Coverage Litigation ............................................................................ 5

III.   STANDARD ON A MOTION PURSUANT TO RULE 12(C) ........................... 6

IV.   THE POLICIES ARE DUTY TO INDEMNIFY POLICIES, NOT DUTY TO DEFEND POLICIES ........................................................................................ 7

V.    THE APPLICABILITY OF THE PROFESSIONAL SERVICES EXCLUSION ........... 8

VI.   DEFENDANTS' RELY ON CASES THAT ARE DISTINGUISHABLE .................... 12

VII.  THE PROFESSIONAL SERVICES EXCLUSION IS NOT AMBIGUOUS, BUT IN ANY EVENT, CONTRA PROFERENTEM DOES NOT APPLY BECAUSE GID IS A SOPHISTICATED BUSINESS ENTITY ........................................ 16

VIII. GID, IN PURCHASING THE POLICIES, CHOSE NOT TO INSURE WINDSOR FOR ITS PROFESSIONAL SERVICES ................................................... 17

IX.   CHUBB'S COVERAGE DETERMINATION DOES NOT BIND PLAINTIFFS ........ 18

X.    DEFENDANTS ARE NOT ENTITLED TO ATTORNEYS' FEES EVEN IF THEY ARE SUCCESSFUL .................................................................................. 20

XI.   CONCLUSION.................................................................................................. 20

4887-1628-9752.1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*,
    449 Mass. 621 (2007) ............................................................................................19

*Bagley v. Monticello Ins. Co.*,
    430 Mass. 454 (1999) .........................................................................................8, 14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................6

*Boston Gas Co. v. Century Indem. Co.*,
    454 Mass. 337 (2009) .............................................................................................17

*Camp Dresser & McKee, Inc. v. Home Ins. Co.*,
    568 N.E.2d 631 (Mass. App. Ct. 1991) ..................................................................14

*Certain Underwriters at Lloyd's London v. Health Care Management Partners*,
    Civil Action No. 05-CV-00373 U.S. Dist. LEXIS 49498 (D. Colo. 2006) .............15

*Chebotnikov v. LimoLink, Inc.*,
    150 F. Supp. 3d 128 (D. Mass. 2015) ......................................................................8

*Citation Ins. Co. v. Gomez*,
    426 Mass. 379 (1998) .............................................................................................16

*Clark Sch. For Creative Learning, Inc. v. Phila. Indem. Ins. Co.*,
    2012 U.S. Dist. LEXIS 184195 (D. Mass. 2012) .....................................................8

*Colony Ins. Co. v. Expert Grp. Int'l Inc.*,
    No. 1:15-cv-02499-RPM, 2017 U.S. Dist. LEXIS 75073 (D. Colo. May 17,
    2017) ......................................................................................................................15

*Colony Ins. Co. v. Fladseth*,
    No. C 12-1157, 2013 U.S. Dist. LEXIS 48552 (N.D. Cal. Apr. 3, 2013) ...............16

*Div. v. Great Am. E&S Ins. Co.*,
    2021 Mass. App. Unpub. LEXIS 486, *3; 99 Mass. App. Ct. 1132 (2021) ..............8

*Essex Ins. Co. v. Berkshire Env't Consultants, Inc.*, 2002 U.S. Dist. LEXIS 2044
    (D. Mass. Feb. 7, 2002)..........................................................................................14

*Gorelick v. Star Mkts. Co., Inc.*,
    102 Mass. App. Ct. 219 (2023)...............................................................................20

4887-1628-9752.1

*Grajales v. P.R. Ports Auth.*,
   682 F. 3d 40 (1st Cir. 2012) ...................................................................................6

*GRE Ins. Grp. v. Metro. Bos. Hous. P'ship, Inc.*,
   61 F.3d (1st Cir. 1995) .............................................................................8, 9, 12, 16

*Great Clips, Inc. v. Hair Cuttery of Greater Boston, L.L.C.*,
   591 F. 3d 32 (1st Cir. 2010) ...................................................................................8

*Hanover Ins. Co. v. Golden*,
   436 Mass. 584 (2002) ...........................................................................................20

*Haynes v. RealPage, Inc. et. al.*,
   1:23-cv-3813 (N.D. Ga. Aug. 25, 2023) ..............................................................4, 5

*Jefferson Ins. Co. v. Nat'l Union Fire Ins. Co.*,
   42 Mass. App. Ct. 94 (1997) .................................................................................14

*John T. Callahan & Sons, Inc. v. Worcester Ins. Co.*,
   453 Mass. 447 (2009) ...........................................................................................20

*Kabisch v. RealPage. Inc., et al.*
   No. 3:23-cv-000742 (M.D. Tenn. Jul. 24, 2023) .................................................4, 5

*Med. Recs. Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.*,
   142 F.3d 512 (1st Cir. 1998) .................................................................................14

*O'Hara v. Std. Fire Ins. Co.*,
   2017 U.S. Dist. LEXIS 219749 (D. Mass. 2017) .................................................16

*Preferred Mut. Ins. Co. v. Gamache*,
   426 Mass. 93 (1997) .............................................................................................20

*Principal Mut. Life Ins. Co. v. Raal-Datacom, Inc.*,
   233 F. 3d 1 (1st Cir. 2000) ....................................................................................16

*R.G. Fin. Corp. v. Vergara-Nunez*,
   446 F.3d 178 (1st Cir. 2006) ...................................................................................6

*In Re: RealPage, Inc. Rental Software Antitrust Litigation*
   (No. II), No. 3:23-md-03071 (M.D. Tenn. Nov. 15, 2023) ......................................4

*Reliance Nat. Ins. Co. v. Sears, Roebuck & Co.*,
   58 Mass. App. Ct. 645 (2003) ...............................................................................14

*Rob Levine & Assocs. v. Travelers Cas. & Sur. Co. of Am.*,
   994 F. Supp. 2d 228 (D.R.I. 2014) .......................................................................12

4887-1628-9752.1

*Roe v. Federal Ins. Co.*,
   412 Mass. 43 (1992) ................................................................................9, 12, 13

*Sarvis v. Polyvore, Inc.*,
   2013 U.S. Dist. LEXIS 112539 (D. Mass. 2013) ....................................................6

*Sentinel Prods. Corp. v. Scriptoria, N.V.*,
   124 F. Supp. 2d 115 (D. Mass. 2000) ...................................................................16

*Sparta Ins. Co. v. Pa. Gen. Ins. Co.*,
   651 F. Supp. 3d 391 (D. Mass. 2023) .....................................................................6

*St. Consulting Grp., Inc. v. Eastern Ins. Grp., LLC*,
   32 Mass. L. Rep. 8 (2014)................................................................... 12-14, 16

*St. Paul Fire & Marine Ins. Co. v. Asbury*,
   149 Ariz. 565 (Ct. App. 1986) .........................................................................12, 13

*Starr v. Fordham*,
   420 Mass. 178 (1995) ............................................................................................14

*Veolia N. Am., Inc. v. Great Am. E&S Ins. Co.*,
   Nos. 144739, 1984-CV-0679-BLS2, 2020 Mass. Super. LEXIS 103 (May 20,
   2020) .......................................................................................................................19

*Welch Foods, Inc.*
   2011 U.S. Dist. LEXIS 17134, *6 (D. Mass. 2011)............................................7, 8

*Wilkinson v. Citation Ins. Co.*,
   447 Mass. 663 (2006) ............................................................................................20

*Zhovmiruk v. RealPage, Inc., et al.*,
   No. 2:22-cv-01779 (W.D. Wash.)........................................................................4, 5

**Other Authorities**

Fed. Rule Civ. Proc. RULE 12(C) ...............................................................................6

Fed. Rule Evid. 201(b)(2) ............................................................................................6

4887-1628-9752.1

# I.
# <u>INTRODUCTION</u>

Defendants would have this Court believe that Windsor Property Management Company ("Windsor") founded in 1960, serving over 145 communities, in 24 markets across the country, employing 1,000 associates, and the 17th largest apartment owner in the country, does not engage in professional services when it conducts research and utilizes analytics to determine rent, supply, and price for the properties it manages. https://www.windsorcommunities.com/about-us/. The Underlying Litigation (defined below) alleges that Windsor paid for, and used, at least one RealPage RMS—LRO—to manage some or all of its more than 86,000 multifamily rental units nationwide, and that Windsor operates in the following regional submarkets: Atlanta, Austin, Baltimore, Boston, Charlotte, Chicago, Dallas-Fort Worth, Denver, Houston, Los Angeles, Miami, New York, Portland, San Diego, San Francisco, San Jose, Seattle, and Washington.

Defendant GID Investment Advisers Corporation's ("GID") website advertises Windsor as having "earned a reputation for outstanding property maintenance and property-level financial performance and has been recognized as a leader in resident satisfaction by ORA and Kingsley[1]." https://gid.com/our-capabilities/property-management/ GID's website also advertises Windsor as having a "strong on-site and experienced regional leadership team" which "provide a state-of-the-art, fully-integrated suite of property management services" which are "backed by professional maintenance, training, purchasing, revenue management, and ancillary revenue support personnel." Included in Windsor's "core competencies" are "[a] best practices technology platform, including SEO and marketing analytics, daily pricing optimization, data warehouse and visualization tools, responsive-design prospect and resident portals, and resident package-handling

---

[1] Upon information and belief, it appears that ORA and Kingsley refer to a rating system that rates multifamily companies based on certain data points.

1

solution." Indeed, among the services offered by Windsor are leasing, property management, collections, and technology.

What Windsor's residents expect from Windsor is the professionalism and expertise Windsor's staff is trained in, and Windsor advertises and touts. This includes determining a fair equitable rental price based on market conditions. Contrary to Defendants' Motion, Windsor is not akin to a single household determining rent for a room or a single home. Rather, Windsor is a highly reputable, professional real estate management company that owns the properties it also manages. Moreover, Windsor is part of the GID family which is "a vertically-integrated real estate developer, investor and operator." https://gid.com/company/. GID has "divisions specializing in development, acquisitions, real estate funds, portfolio and asset management, and property management." GID is an "active buyer and developer" of various types of real estate "on behalf of our institutional co-investment partners and for our own account."

Based on Windsor's and GID's websites and the allegations in the Underlying Litigation, Plaintiffs concluded that Windsor engages in professional services when it determines rent for the 86,000 units it manages nationwide and therefore denied coverage for the Underlying Lawsuit based on Plaintiffs' good faith evaluation. In challenging Plaintiffs' determination, Defendants' Motion asserts that Windsor's pricing determinations lack any specialized knowledge, labor, or skill[2]. As such, how Windsor decides pricing for the 86,000 units nationwide will need to be the subject of discovery, and Plaintiffs have propounded discovery to that effect.

In addition to challenging Plaintiffs' understanding of the professional nature of Windsor's services, Defendants have also raised issues in their Answer and Counterclaims, as well as in their

---

[2] Indeed, if as Defendants' contend it was so simple to determine pricing based on supply and market in order to optimize revenue, then why the need to incur the costs associated with and provide the ongoing reams of information required to participate in RealPage as alleged in the Underlying Lawsuit?

2

Motion, which involve questions about the underwriting of the Policies (defined below) including Defendants' purported reasonable expectations when procuring the Policies. All of these arguments require additional discovery to provide a fulsome record for the Court to establish judgment in either Party's favor. Defendants have also propounded discovery on the use, application, meaning, and intent of the Professional Services Exclusion and the lack of inclusion of an anti-trust exclusion, as well as Plaintiffs' application of the Professional Services Exclusion in other cases. While Plaintiffs object to many of these discovery requests and may ultimately challenge them as the Policies are clear and this matter involves application of the Policies' terms to the facts surrounding the Underlying Litigation, Plaintiffs also presume that these discovery requests were propounded because Defendants contend they have some bearing on this action (the "Coverage Litigation") and are not aimed solely to harass Plaintiffs on non-relevant discovery.

Indeed, while Plaintiffs agree that whether the Professional Services Exclusion applies is a question of law and intend to move for summary judgment at the close of discovery on the applicability of this Professional Services Exclusion, Defendants' Motion is premature and should be denied in its entirety.

**II.**
**BACKGROUND**

A.    **Policies**

Federal Insurance Company ("Chubb") issued an Asset Management Protector℠ Policy to "GID Investment Advisors Corporation" for the Policy Period of October 1, 2022 to October 1, 2023 (the "Chubb Policy").[3] The Chubb Policy includes three coverage parts: (i) Directors & Officers ("D&O") Liability Coverage Part; (ii) Professional Liability ("PL") Coverage Part; and

---

[3] Pursuant to the Endorsement No. 2 of the Chubb Policy, additional GID companies were added as Named Organizations. For ease of reference, GID Investment Advisers and these other companies named in Endorsement No. 2 will be collectively referred to as "GID."

3

(iii) Private Fund Coverage Part. The Parties agree that the relevant coverage is the D&O Part which has a Limit of Liability of $5,000,000, subject to a $500,000 Retention for each Claim.[4]

Plaintiff Argonaut Insurance Company ("Argonaut") issued a Follow Form Excess Insurance Policy, Policy No. MLX4244704-3 (the "Argo First Excess Policy") to GID which contains a limit of liability of $5 million excess to $5 million in Underlying Insurance (excess of the relevant retention) and follows form to the Chubb Policy except where otherwise noted.[5] Plaintiff Zurich American Insurance Company ("Zurich") issued an Excess Select Insurance Policy No. EOC 6527312 00 (the "Zurich Second Excess Policy") which contains a limit of liability of $5 million excess to $10 million in Underlying Insurance (excess of the relevant retention) and follows form to the Chubb Policy except where otherwise noted.[6] The Chubb Policy, the Argo First Excess Policy, and the Zurich Second Excess Policy are collectively referred to as the "Policies."

**B.      The Underlying Litigation**

On December 16, 2022, Yelizaveta Zhovmiruk initiated a class action lawsuit against multiple defendants, including Windsor, in a lawsuit captioned *Zhovmiruk v. RealPage, Inc., et al.*, No. 2:22-cv-01779 (W.D. Wash.) (the "Zhovmiruk Litigation"). Windsor was subsequently named in two additional lawsuits, *Kabisch v. RealPage. Inc., et al*. No. 3:23-cv-000742 (M.D. Tenn. Jul. 24, 2023) (the "Kabisch Litigation"); and *Haynes v. RealPage, Inc. et. al.*, 1:23-cv-3813 (N.D. Ga. Aug. 25, 2023) (the "Haynes Litigation"). Those cases were referred to the Judicial Panel on Multidistrict Litigation, which transferred all actions under *In Re: RealPage, Inc. Rental*

---

[4] A copy of the Chubb Policy is attached as Exhibit 1 to the First Amended Complaint ("FAC").
[5] A copy of the Argo Excess Policy is attached as Exhibit 2 to the FAC.
[6] A copy of the Zurich Second Policy is attached as Exhibit 3 to the FAC.

4

*Software Antitrust Litigation* (No. II), No. 3:23-md-03071 (M.D. Tenn. 2023) ("Underlying Litigation").[7]

###### C.    Coverage Litigation

Prior to the commencement of the Coverage Litigation, Plaintiffs were informed that, by letter dated January 23, 2023, Chubb initially denied coverage for the Underlying Litigation pursuant to the Professional Services Exclusion. FAC, ¶42. Also, prior to the commencement of this Coverage Litigation, Plaintiffs were informed that, after Chubb's denial, Chubb and GID exchanged several letters, including a letter from GID's counsel dated October 27, 2023. FAC, ¶43. Even though Argonaut requested copies of these letters, as well as any other correspondence exchanged, none were provided. FAC, ¶43. Only when the Defendants filed their Answer and Counterclaims to the FAC was one of the letters - GID's October 27, 2023 letter (attached as Exhibit I) – provided. Plaintiffs have requested Chubb's January 23, 2023 letter in discovery but have not received it. Much to Plaintiffs' surprise, Chubb issued a letter dated November 15, 2023 in which Chubb reversed its coverage denial and agreed to provide coverage for Windsor in the Underlying Litigation, although, in doing so, Chubb reserved its rights on several provisions, including the Professional Services Exclusion. Unlike the January 23, 2023 letter, Chubb's November 15, 2023 letter was provided to the Plaintiffs.[8] After Plaintiffs' independent coverage investigation and evaluation, they each issued a denial letter on or about April 15, 2024 and commenced the Coverage Litigation requesting the Court to declare the rights and obligations of the Parties.

---

[7] A copy of the operative Second Amended Complaint ("Underlying Complaint") in the Underlying Litigation is attached as Exhibit 4 to the FAC. Defendants contend that the parties stipulated to the dismissal of all claims in the Zhovmiruk Litigation and that the case closed on February 22, 2024. Defendants also contend that plaintiffs voluntarily dismissed the claims against Windsor in the Kabisch Litigation and that the Haynes Litigation is the only active case that remains part of the Underlying Litigation.

[8] Chubb's November 15, 2023 letter is attached as Exhibit 5 to the FAC.

4887-1628-9752.1

### III.
### STANDARD ON A MOTION PURSUANT TO RULE 12(C)

A motion for judgment on the pleadings pursuant to Fed. Rule Civ. Proc.12(c) shall not be granted where the complaint satisfies the plausibility standard. *See Grajales v. P.R. Ports Auth.*, 682 F. 3d 40 (1st Cir. 2012); *Sparta Ins. Co. v. Pa. Gen. Ins. Co.*, 651 F. Supp. 3d 391, 397 (D. Mass. 2023). Plaintiffs satisfy that standard when, assuming the truth of all well-pleaded facts and given the benefit of all reasonable inferences, the factual allegations raise a right to relief above the speculative level. *See Grajales*, 682 F. 3d at 44 (plausibility determinations must be evaluated in light of the truism that a complaint need only a short and plain statement of the claim showing that the pleader is entitled to relief); See *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *R.G. Fin. Corp. v. Vergara-Nunez*, 446 F.3d 178, 182 (1st Cir. 2006).

In addition to the complaint's well-pleaded facts, a court may consider documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice. *Grajales, supra*. A court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination. *See Sarvis v. Polyvore, Inc.*, 2013 U.S. Dist. LEXIS 112539, *9, *33 n.3 (D. Mass. 2013); Fed. Rule Evid. 201(b)(2). A court may only enter a judgment on the pleadings if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment. *Sparta, supra*, quoting *Aponte-Torres v. University of P.R.*, 445 F. 3d 50, 54 (1st Cir. 2006).

At this stage of the litigation, Defendants do not come close to conclusively establishing their entitlement to a favorable judgment on the Professional Services Exclusion. Defendants' Motion and their Answer and Counterclaims raise issues as to the nature of the services Windsor provides, among other things, which will need to be addressed in discovery so that the Court may

4887-1628-9752.1

be presented with a fulsome record before deciding judgment in either Party's favor. Defendants have also propounded discovery on the use, application, meaning, and intent of the Professional Services Exclusion, Plaintiffs' decision not to include an anti-trust exclusion in their Policies, and Plaintiffs' application of the Professional Services Exclusion in other cases. While Plaintiffs have objected to some of this discovery for several reasons, Defendants have raised these issues at the same time moving for judgment as a matter of law.

While Plaintiffs agree with the Defendants that the question of whether the Professional Services Exclusion applies is a question of law, Defendants have raised so many issues as to render this dispute one more appropriately decided on summary judgment at the close of discovery.

## IV.
## THE POLICIES ARE DUTY TO INDEMNIFY POLICIES, NOT DUTY TO DEFEND POLICIES

As a preliminary matter, Defendants' Motion is based upon the wrong standard since the Policies contain no duty to defend. The Policies at issue here are not duty to defend policies but duty to indemnify policies. *See* Ex. 1 to FAC, Chubb Policy, General Terms and Conditions ("GTC"), Section VII.(A) (stating in part that "It shall be the duty of the **Insured** and not the duty of the Company to defend **Claims** made against the **Insured**.") Relying upon that incorrect standard, Defendants incorrectly argue that success on their Motion turns on a comparison of the allegations in the Underlying Complaint against the Policies and whether the losses alleged could be covered by the Policies. In support, Defendants rely on cases which assess coverage under the standards applicable to a duty to defend policy and not an indemnity policy. *See* Defendants' Memorandum ("Mem.") p. 9. Defendants then argue that, as long as no exclusion applies, the Insurers have a duty to advance defense costs when the underlying insurance exhausts. But, again, the Policies at issue here are not duty to defend policies and thus the standard upon which Defendants rely is inapplicable. Indeed, in one of the cases relied upon by Defendants, *Welch*

7

*Foods, Inc.*, 2011 U.S. Dist. LEXIS 17134, \*6 (D. Mass. Feb. 9, 2011), the court expresses the standard for duty to indemnify policies when it states that "while an insurer's duty to indemnify runs to claims that are actually covered, an insurer's duty to defend runs to claims that are merely potentially covered."

**V.**

**THE APPLICABILITY OF THE PROFESSIONAL SERVICES EXCLUSION**

The Professional Services Exclusion provides as follows: "The Company shall not be liable for **Loss** on account of any **Claim** under this Coverage Part: "based upon, arising from, or in consequence of performing or the failure to perform any professional service;…"

Defendants do not dispute that the term "based upon", "arising from" or "in consequence of" should be broadly construed. *Great Clips, Inc. v. Hair Cuttery of Greater Boston, L.L.C.*, 591 F. 3d 32, 36 (1st Cir. 2010), (quoting *Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co.*, 220 F. 3d 1, 7 (1st Cir. 2000)); *Chebotnikov v. LimoLink, Inc.*, 150 F. Supp. 3d 128 (D. Mass. 2015) (Court interpreting policy language "arising from" to be equivalent to "arising under," "arising out of," or "arising from"); *Clark Sch. For Creative Learning, Inc. v. Phila. Indem. Ins. Co.*, 2012 U.S. Dist. LEXIS 184195, at \*13 (D. Mass. 2012) ("Arising out of" is generally understood to mean "originating from," "growing out of," "flowing from," "incident to," or "having connection with."); *see also Bagley v. Monticello Ins. Co.*, 430 Mass. 454, 457 (1999) (Cases interpreting the phrase "arising out of" in insurance exclusionary provisions suggest a causation more analogous to "but for" causation) (internal quotations and citations omitted); *Div. v. Great Am. E&S Ins. Co.*, 2021 Mass. App. Unpub. LEXIS 486, \*3; 99 Mass. App. Ct. 1132 (2021) ("based upon, arising out of, or related to" language is broadly interpreted).

Plaintiffs agree with Defendants that, in determining whether a Professional Services Exclusion applies, a court must analyze whether the relevant activity was "professional" in nature.

8

*See GRE Ins. Grp. v. Metro. Bos. Hous. P'ship, Inc.*, 61 F.3d at 81, 83 (1st Cir. 1995). Specifically, Massachusetts courts have reasoned that to be engaged in professional services requires something more than an act flowing from mere employment: "A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving *specialized knowledge*, labor, or skill and the labor or skill involved is *predominantly mental or intellectual*, rather than physical or manual." *Id.* at 84 citing *Roe v. Federal Ins. Co.*, 412 Mass. 43 (1992) (emphasis added).

Based on the allegations in the Underlying Litigation, there is no dispute that the lawsuit filed against Defendants is based upon, arises from, or is in consequence of Windsor's performance or failure to perform ***professional*** services. The proposed class in the Underlying Complaint (¶681) consists of renters who were the alleged victims of Owner-Operators like Windsor who in rendering professional services allegedly agreed to be part of a purported price fixing conspiracy.

Defendants contend that the Underlying Litigation does not arise out of Windsor's professional services because "setting rental prices is a routine business decision made not just by commercial apartment owners, but also by untrained individual property owners across the country." Defendants' Mem. at 13-14. Relying on *Roe*, 412 Mass. 43 (1992) and its progeny, Defendants argue that determining rental prices is not professional in nature because it does not "involve a vocation, calling, occupation, or employment involving specialized knowledge, labor or skill." Defendants' Mem. at 11.

But contrary to Defendants' argument, Windsor is not an untrained individual property owner. Indeed, Windsor is in no way comparable to an individual trying to rent out a room or a home as Defendants would have this Court believe. As described in detail above, Windsor is a highly sophisticated national company that is part of the GID organization which is "a vertically-integrated real estate developer, investor and operator." https://gid.com/company/. In addition to

9

4887-1628-9752.1

managing its 86,000 residential units and 32.5 million square feet of commercial space, GID develops, acquires, manages real estate funds, specializes in portfolio and asset management, not just for itself but for institutional co-investment partners. *Id.* Windsor advertises and prides itself in being one of the best property management companies in the country and describes one of its core competencies as a "best practices technology platform, including SEO and marketing analytics, daily pricing optimization, data warehouse and visualization tools, responsive-design prospect and resident portals, and resident package-handling solutions." (https://gid.com/our-capabilities/property-management/). Among the services offered by Windsor are leasing, property management, and technology.

Moreover, there could not be a wider disparity between Defendants' arguments and realty. On the one hand, Defendants market themselves to the public as highly specialized Owner-Operators, while on the other hand, their Motion disingenuously downplays their services in a flawed attempt to compare themselves to an individual trying to figure out what to charge a college student renting a room. By way of their Motion, Defendants are trying to avoid Plaintiffs' discovery on this very subject matter. Defendants' argument also raises the question: if the activity of setting rental prices was so simple and provincial, why the need to join with a host of other large nationwide property managers to use highly sophisticated software to accomplish that task? Indeed, the Underlying Litigation alleges that the setting of rental prices and usage of the RealPage software was not a routine task. Cartel members purportedly had to provide "RealPage with vast amounts of their non-public proprietary data, including their lease transactions, rent prices, and occupancy and inventory levels." Underlying Complaint, ¶13. This information was then combined with "other data-analytics, benchmarking, and rental-management software products" and "machine learning and artificial intelligence algorithms" to generate daily rental prices. *Id.*

The Underlying Litigation alleges that, for these services, defendants in the Underlying Litigation paid a one-time licensing fee plus a monthly $1 to $2 per unit with some defendants paying more. *See* Underlying Complaint, ¶14.[9] The Underlying Litigation further alleges that RealPage also charges thousands of dollars in various other ancillary fees, such as consulting fees and site-training fees, monthly Pricing Advisory Services fees (which are charged on a per unit basis and can double the per unit fee), and corporate training fees. *See* Underlying Complaint ¶14. It is yet unknown whether Windsor purchased these ancillary services.

Indeed, one of the core services that Windsor provides to its residents is determining a fair rental price based on competitive market conditions in the local marketplace. The Underlying Litigation alleges that Owner-Operators, like Windsor, failed to do that when Windsor agreed to enter into a nationwide conspiracy to inflate rental prices to the detriment of the residents and tenants Windsor served.

Based on these allegations alone, which represent a fraction of the allegations in the Underlying Complaint, it was clear to the Plaintiffs when they denied coverage pursuant to the Professional Services Exclusion that the Underlying Litigation involves allegations against Windsor for activities that are professional in nature. Defendants dispute that conclusion and in doing so raise issues in their Motion, their Answer with Counterclaims, and discovery as to the allegedly non-professional nature of Windsor's services, the underwriting of the Policies, and the reasonable expectations of the Defendants when procuring the Policies, among other things, all of which will need to be addressed in discovery so as to confirm that the evidence relied upon by the

---

[9] As Windsor is alleged to manage 86,000 units, Windsor was potentially paying $86,000 to $172,000 or more on a monthly basis for this allegedly routine task.

Plaintiffs when issuing their denials support application of the Professional Services Exclusion. Indeed, Plaintiffs intend on moving for summary judgment at the close of discovery.

## VI.
## DEFENDANTS' RELY ON CASES THAT ARE DISTINGUISHABLE[10]

Plaintiffs do not dispute that some of the cases cited by Defendants held that the underlying suits did not allege professional services within the meaning of the applicable policies' professional services exclusion. All of those cases, however, are readily distinguishable from the instant action. For instance, Defendants rely on *Metro. Bos. Hous. P'ship, Inc.*, a decision in which the Court held the professional services exclusion did not relieve the insurer of its ***duty to defend*** claims that allegedly went beyond professional services. Moreover, the issue of whether the insured engaged in "professional services," was a question the First Circuit remanded ***given the duty to defend***.

Defendants' reliance on *Roe,* 412 Mass. 43, is equally unavailing. In *Roe*, the Court concluded that as a matter of law, a dentist who sexually assaulted a patient during office visits, even in the course of treatment, did not do so in the course of rendering professional acts or services. Plaintiffs agree. However, *Roe* is inapposite to the facts alleged in the Underlying Litigation since Defendants' actions arose out of their collective specialized knowledge in managing rental properties, including determining how to market and price rental units. A more appropriate case to consider, which the *Roe* Court acknowledged, is *St. Paul Fire & Marine Ins. Co. v. Asbury*, 149 Ariz. 565 (Ct. App. 1986). In *Asbury,* the Court concluded that a sexual assault

---

[10] Defendants suggest that the Professional Services Exclusion applies more to malpractice type cases and rely on a single footnote in a District Court case in Rhode Island, *Rob Levine & Assocs. v. Travelers Cas. & Sur. Co. of Am.*, 994 F. Supp. 2d 228, 233 n.7 (D.R.I. 2014). But Defendants cannot cite to any case applying Massachusetts law that has held that such an exclusion is only applicable to malpractice cases. *See Saint Consulting Grp., Inc. v. E. Ins. Grp., LLC*, 32 Mass. L. Rep. 8 (2014) (Court applied Professional Services Exclusion in racketeering case to exclude coverage).

by a gynecologist during a routine examination did involve the rendering of professional services. The *Roe* Court agreed with the *Asbury* court's reasoning that the assault was part of the professional services rendered and was thus precluded. The Underlying Litigation is more akin to *Asbury*, where there is a direct connection between Defendants' professional services and the allegations of wrongdoing pled against Defendants and not as in *Roe* where the allegations were disconnected from the professional services.

More recently, *Roe* and its narrow interpretation of the term "professional services" was specifically rejected by a Massachusetts court in *St. Consulting Grp., Inc. v. Eastern Ins. Grp., LLC*, 32 Mass. L. Rep. 8 (Super. Ct. 2014). *St. Consulting* involved a business entity seeking coverage for an antitrust lawsuit. In holding that a professional services exclusion identical to the professional services exclusion at issue here precluded coverage, the *St. Consulting* court found that the "allegedly unlawful anticompetitive activities" were done by the Insured while "carrying out what [the insured] calls its 'core business'; that is, its professional services." *Id.* at *10-11. The insured in *St. Consulting*, like the Defendants here, argued that since the underlying lawsuit is based on allegedly unlawful anticompetitive activities, and that the insured was not hired to violate antitrust laws, the services rendered cannot be professional services. The *St. Consulting* Court rejected that argument. *Id.* at 11. In refusing to "[construct] the professional services exclusion [so narrowly] to the point of insignificance," the *St. Consulting* Court reasoned that

> By its very language, the exclusion in the policy at issue applies to any claim arising from, or in any way related to, the rendering of professional services. This sort of language in insurance policies must be read expansively, incorporating a greater range of causation than that encompassed by proximate cause under tort law. Typically, this sort of language in insurance exclusionary provisions suggests a causation more analogous to a "but for" causation, in which the court examining the exclusion inquires whether there would have been a basis for [the underlying] suit in the absence of [the insured]'s professional services.

13

*Id.* at 13. *Bagley*, 430 Mass. at 457

The Court held that "[a]ll lawsuits are predicated on allegations of unlawful activity" *id. at 11; see also Starr v. Fordham*, 420 Mass. 178 (1995) and that the professional services exclusion applied to anti-competitive claims. To find otherwise would effectively make Windsor immune from any lawsuit alleging professional services if couched under an antitrust claim.

In *Essex Ins. Co. v. Berkshire Env't Consultants, Inc.*, another duty to defend holding Defendants cite to, the Court found that a professional services exclusion did not excuse the insurer's defense obligations where the services included a mix of both professional and non-professional services. 2002 U.S. Dist. LEXIS 2044, at *2 (D. Mass. Feb. 7, 2002). The Court reasoned that because the underlying matter included acts that were administrative, managerial, or clerical, the exclusion would not apply to all of the alleged claims. In contrast, the Underlying Litigation here includes only two counts, both of which arise out of Defendants' rendering of professional services. Therefore, *Berkshire Env't Consultants* provides no guidance here.[11]

In *Jefferson Ins. Co. v. Nat'l Union Fire Ins. Co.*, 42 Mass. App. Ct. 94 (1997), another case relied on by the Defendants, the court held that a miscommunication between a dispatcher and an ambulance driver as to the address of an emergency was not and could not be considered a professional service. Defendants' reliance on *Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 568 N.E.2d 631 (Mass. App. Ct. 1991) for the notion that managerial tasks do not require the "exercise of professional judgment," fails for the same reasons noted above regarding *Jefferson*.[12]

---

[11] For similar reasons, Defendants' reliance on *Med. Recs. Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 142 F.3d 512 (1st Cir. 1998) and *Reliance Nat. Ins. Co. v. Sears, Roebuck & Co.*, 58 Mass. App. Ct. 645 (2003) are likewise misplaced. Both cases involve the issue of billing or overbilling for professional services. In both holdings, the services were correctly deemed not professional since the services did not involve *specialized knowledge*.

[12] *Camp Dresser* is further distinguishable since the Court concluded that the Engineers, Architects or Surveyors Professional Liability Exclusion included an ambiguous term. The Court found the word "supervisory" to be reasonably susceptible of ambiguous interpretation, covering potentially both professional and non-professional activities. There is no such ambiguity in the Professional Services Exclusion at issue in this Coverage Litigation.

14

4887-1628-9752.1

Finally, Defendants cite to several unrelated cases to argue that Plaintiffs or their affiliates have inconsistently interpreted the term "professional services." The argument is a red herring and patently false. First, in *Colony Ins. Co. v. Expert Grp. Int'l Inc.,* No. 1:15-cv-02499-RPM, 2017 U.S. Dist. LEXIS 75073 (D. Colo. May 17, 2017), Defendants claim that Colony, an Argonaut affiliate, cited case law arguing that "professional services" has been construed to mean "services rendered by a recognized professional in the fields of medicine, law, accounting, or architecture. Such professionals are distinguished by specialized training or education, state licenses, and legal liability for professional negligence or malpractice." However, in that case, the term "professional services" was narrowly defined[13] and tailored specifically to the medical services.[14] As such, the additional case law cited by Colony supported the proposition that a "professional act or service" arises out of employment involving specialized knowledge.

Second, Defendants cite to *Certain Underwriters at Lloyd's London v. Health Care Management Partners*, Civil Action No. 05-CV-00373, U.S. Dist. LEXIS 49498 (D. Colo. 2006) a case where Zurich was a co-plaintiff. Here, again, the case law cited stood for the proposition that a "professional" act or service is one arising out of "a[n]…employment involving specialized knowledge, labor, or skill and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." As noted above, Plaintiffs do not disagree with that proposition,

---

[13] Professional Services was defined in the Colony policy as:

   a.  medical, surgical, dental, x-ray, mental health or nursing service or treatment, or the furnishing of food or beverage in connection with such service or treatment; b. medications, medical supplies or medical appliances; c. health or therapeutic service, treatment or advice; d. counseling or social service; e. postmortem handling of human bodies including organ or tissue recovery; and f. services undertaken for your formal accreditation standards review or equivalent professional board or committee for any insured

[14] Colony in citing to the case law did so to demonstrate that other courts had reached *similar*, rather than identical determinations that "professional services" require the activity to involve some sort of specialized knowledge and training which is consistent with Plaintiffs' position here.

namely that, under Massachusetts law, this specialized knowledge inquiry is the starting point of the analysis. *See Metro. Bos. Hous. P'ship, Inc.*, at 81. And, as detailed above, the services of Defendants complained of in the Underlying Litigation were professional services that required specific training and specialized knowledge which is not only consistent with previous arguments made by Plaintiffs but is the reason why the professional services exclusion precludes coverage.[15]

As such, Defendants' cases referenced above do not support their Motion.

### VII.
### THE PROFESSIONAL SERVICES EXCLUSION IS NOT AMBIGUOUS, BUT IN ANY EVENT, *CONTRA PROFERENTEM* DOES NOT APPLY BECAUSE GID IS A SOPHISTICATED BUSINESS ENTITY

Defendants argue in the alternative that it is irrelevant whether the Underlying Litigation involves professional services rendered by Windsor since the term "professional services" as used in the Professional Services Exclusion is ambiguous, so therefore the Court should find in favor of coverage. It is well-settled Massachusetts law that a contract is not ambiguous merely because a controversy exists between the parties, each favoring an interpretation contrary to the other. *See Citation Ins. Co. v. Gomez*, 426 Mass. 379, 381 (1998); *O'Hara v. Std. Fire Ins. Co.*, 2017 U.S. Dist. LEXIS 219749, *9 (D. Mass. 2017). But even assuming *arguendo* that there was a controversy as to the meaning of the term "professional services," which there is not, the doctrine of *contra proferentem* is one of last resort in Massachusetts and is especially tenuous when the parties are sophisticated businesses." *See Principal Mut. Life Ins. Co. v. Raal-Datacom, Inc.*, 233 F. 3d 1, 10 (1st Cir. 2000); *Sentinel Prods. Corp. v. Scriptoria, N.V.*, 124 F. Supp. 2d 115, 117 (D. Mass. 2000), quoting; *St. Consulting*, 32 Mass. L. Rep. at 9-10. Here, there is no question that for

---

[15] Defendants also cite to *Colony Ins. Co. v. Fladseth*, No. C 12-1157, 2013 U.S. Dist. LEXIS 48552 (N.D. Cal. Apr. 3, 2013) wherein Colony argued that the term "professional services" does not include the business or administrative aspects of the profession. However, Plaintiffs do not argue here that the actions of Defendants at the heart of the Underlying Litigation were business or administrative in nature and therefore the case is likewise not applicable.

16

all the reasons discussed above, Defendants are sophisticated business entities. Moreover, they were also represented by a sophisticated insurance broker in the drafting and negotiation of the Policy terms. Therefore, the doctrine of *contra proferentem* does not apply.

**VIII.**
### GID, IN PURCHASING THE POLICIES, CHOSE NOT TO INSURE WINDSOR FOR ITS PROFESSIONAL SERVICES

While the Parties agree that the relevant Coverage Part is the D&O Part, the provisions of the PL Part are telling since they evidence GID's expectations regarding the type of professional services it wanted covered under these Policies. It has long been recognized in Massachusetts that in interpreting an insurance policy, "every word . . . 'must be presumed to have been employed with a purpose and must be given meaning and effect whenever practicable.'" *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355 (2009) quoting *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 628 (2007).

Here, the PL Part makes clear that GID did not purchase these Policies to insure the types of professional services Windsor provides. The Insuring Clauses of the PL Part, as amended by Endorsement No. 21, provides the following coverages: (i) Insuring Clause (A): Separate Account and Sub-Advisory Liability Coverage; (ii) Insuring Clause (B): Fund Adviser Liability Coverage; (iii) Insuring Clause (C): Fund Service Provider Liability Coverage; and (iv) Independent Contractor Indemnification Coverage. In simplistic terms, the PL Part provides that pursuant to the complete terms and conditions of the Chubb Policy, that for an Investment Adviser, Investment Adviser Services will be covered, for a Fund Service Provider that Fund Services will be covered, and for an Independent Contractor, only services rendered by an Independent Contractor will be covered.

Windsor cannot dispute that it is neither an Investment Adviser providing Investment Adviser Services, nor a Fund Services Provider providing Fund Services, nor an Independent

17

Contractor providing professional services on behalf of an Investment Adviser, as they are defined in Section II. of the PL Part, in part as amended by and/or as added as Endorsement No. 21. And, significantly, GID purposefully chose to *exclude* in the PL Part the types of professional services that Windsor provides. See PL Part, Section III.(L), as amended by Endorsement No. 21 which provides as follows:

> The Company shall not be liable for **Loss** on account of any **Claim** under this Coverage Part:
>
> (L)    based upon, arising from, or in consequence of any **Insured** providing or failing to provide **Real Estate Services**; provided this Exclusion III.(L) shall not apply to **Loss** on account of any **Claim** brought by or on behalf of an investor or client of an **Investment Adviser** based upon, arising from, or in consequence of an investment loss to such investor or client if such investment loss arises out of **Real Estate Services**.

Endorsement No. 21 defines Real Estate Services as "providing or failing to provide real estate development or design, construction, property renovation or rehabilitation, property management services, environmental related services, appraisal, real estate brokerage or sales, architectural services, or engineering services."

In other words, discovery may well confirm that GID affirmatively chose not to procure coverage for Windsor's professional services under these Policies.

## IX.
## CHUBB'S COVERAGE DETERMINATION DOES NOT BIND PLAINTIFFS

Throughout Defendants' Motion, they rely on Chubb's decision to advance Defense Costs for the Underlying Litigation subject to a full reservation of rights to argue that Plaintiffs' coverage determination is incorrect. Not so.

First, Defendants omit a critical fact that – in reserving rights, Chubb did not withdraw its reservation under the Professional Services Exclusion but rather Chubb decided to reserve its rights to the extent the exclusion applies.[16]

Second, Plaintiffs do not know why Chubb ultimately reserved its rights on the Professional Services Exclusion instead of continuing to deny coverage for the Underlying Litigation. Defendants contend that Plaintiffs should accept as fact that Chubb was persuaded by the Defendants.[17] If that was true, why did Chubb leave in place its reservation of rights on application of the Professional Services Exclusion and right to recoup?

Third and more importantly, Defendants' one-sided narrative of how Chubb came to reserve rights as opposed to confirm its denial, while informative, it does not bind Plaintiffs. Plaintiffs have the right to make their own determination of coverage based upon their own investigation and evaluation. It is well-established that excess insurers like Plaintiffs are not bound by the coverage determination made by the primary or any other insurer. *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's*, 449 Mass. 621, 633-634 (2007), rev'd on other grounds (absent an explicit contractual commitment to do so, an excess insurer is not bound by settlement decisions made by a primary insurer); *see Veolia N. Am., Inc. v. Great Am. E&S Ins. Co.*, Nos. 144739, 1984-CV-0679-BLS2, 2020 Mass. Super. LEXIS 103 (May 20, 2020). But, if Defendants are correct that somehow Chubb's decision binds the Plaintiffs, then discovery is needed to understand what caused Chubb to reserve rights on the exclusion as opposed to confirming its denial.

---

[16] Thus, on a finding under its indemnity policy that the Professional Services Exclusion applies, Chubb may be entitled to seek recoupment of all of the monies it has advanced.

[17] Plaintiffs have also requested as part of discovery all communications with Chubb which Defendants have agreed to provide subject to a protective order which the Parties are drafting.

Similarly, any decision by Chubb to recognize **Loss** as eroding its limit does not impact the Plaintiffs. Accordingly, once a summary judgment motion is ripe to be filed after close of discovery, Plaintiffs will brief all of these issues that are the subject of Defendants' Motion.

## X.
### DEFENDANTS ARE NOT ENTITLED TO ATTORNEYS' FEES EVEN IF THEY ARE SUCCESSFUL

Massachusetts follows the American Rule which disallows successful litigants from recovering their attorneys' fees and expenses, absent an agreement by the parties or a statute or rule to the contrary. *Preferred Mut. Ins. Co. v. Gamache*, 426 Mass. 93, 95 (1997). However, Massachusetts recognize an exception to the American Rule, which allows an insured to recover the reasonable attorneys' fees and expenses, but only after *successfully* establishing the insurer's *duty to defend* under the policy. *Gamache*, 426 Mass. at 98; *Hanover Ins. Co. v. Golden*, 436 Mass. 584, 586 (2002); *see also Gorelick v. Star Mkts. Co., Inc.*, 102 Mass. App. Ct. 219, 226-27 (2023); *John T. Callahan & Sons, Inc. v. Worcester Ins. Co.*, 453 Mass. 447 (2009).

This is a narrow exception which is only applicable <u>after</u> a showing successfully establishing an insurer's duty to defend, but this exception does not extend to duty to indemnify cases. *See Wilkinson v. Citation Ins. Co.*, 447 Mass. 663 (2006)*; John T. Callahan & Sons, Inc. v. Worcester Ins. Co.*, 453 Mass. 447, 449 (2009). As the Policies are all duty to indemnify policies (as opposed to a duty to defend policies) this narrow exception does not apply. Therefore, neither party would be entitled to fees.

## XI.
### CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety, and grant such further relief as the Court deems just and appropriate.

4887-1628-9752.1

## REQUEST FOR ORAL ARGUMENT

Plaintiffs request oral argument to the extent that it may assist the Court.

Dated: August 15, 2024            Respectfully submitted,

By:      _/s/ Brian A. O'Connell_
           Brian A. O'Connell, BBO#551182
           Tucker, O'Connell & Fidurko, LLP
           199 Wells Avenue, Suite 301
           Newton, MA 02459
           617-986-6226
           oconnell@toflawfirm.com

           _/s/ Jung H. Park_
           Geoffrey Heineman (Admitted _Pro Hac Vice_)
           Jung H. Park (Admitted _Pro Hac Vice_)
           Ropers Majeski PC
           800 Third Avenue, 29th Floor
           New York, NY 10022
           Geoffrey.heineman@ropers.com
           Jung.park@ropers.com

           _Attorneys for Plaintiffs Argonaut Insurance_
           _Company and Zurich American Insurance Company_

## CERTIFICATE OF SERVICE

I, Jung H. Park, hereby certify that on August 15, 2024, I filed and served this document through the electronic filing system and the document is available for viewing and/or downloading from the United States District Court District of Massachusetts using the CM/ECF system, which will send notification to counsel of record.

           _/s/ Jung H. Park_
           Jung H. Park (Admitted _Pro Hac Vice_)

21