**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARGONAUT INSURANCE COMPANY, ZURICH AMERICAN INSURANCE COMPANY, | Case No.: 1:24-cv-10971-RGS |
| Plaintiffs, | |
| v. | |
| GID INVESTMENT ADVISERS CORPORATION, WINDSOR PROPERTY MANAGEMENT COMPANY, | |
| Defendants. | |

**DEFENDANT / COUNTER-PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR**
**MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

The Windsor Insureds submit this reply brief in further support of their Motion for Partial Judgment on the Pleadings.[1] While the Excess Insurers erroneously assert otherwise, the duty to advance defense costs is assessed based on whether the allegations in the Underlying Litigation potentially fall within the coverage. To avoid their coverage obligation, the Excess Insurers must show that there is no potential that the allegations in the Underlying Litigation fall outside the scope of the Professional Services Exclusion. The Excess Insurers cannot meet this burden.

The Excess Insurers' interpretation of the Professional Services Exclusion would eviscerate the D&O coverage. The Excess Insurers knowingly sold D&O coverage covering claims alleging broadly defined "Wrongful Acts" to a real estate company but, citing broad statements from various websites that are not part of the Underlying Litigation, take the position that the D&O coverage excludes virtually all of the Windsor Insureds' business activities.

At the same time, the language in the Professional Services Exclusion cannot be reasonably construed to encompass the claims and allegations in the Underlying Litigation. The Excess

---

[1] The Windsor Insureds use the same defined terms that were used in their opening Motion.

Insurers do not and cannot identify any allegations in the Underlying Litigation that refer to professional services by Windsor. While the Excess Insurers point to allegations relating to the setting of prices using technology, such acts are not "services" for lessees – let alone "professional" services. Further, the Underlying Litigation does not "arise out of" any such services. The Windsor Insureds' proposed construction of the Professional Services Exclusion is a reasonable one, if not the only one, and any ambiguities must be construed in its favor.

I.    **No Discovery Is Needed Because the Duty to Advance Defense Costs Is Determined Based on Whether the Underlying Suit Alleges Potentially Covered Claims.**

In their Opposition, the Excess Insurers disregard plain language of the Chubb Primary Policy demonstrating that defense coverage is intended to be determined based on the allegations in a Claim. Specifically, in the General Terms and Conditions *AMPlifier* Endorsement, Chubb modified the coverage to make clear that "**Defense Costs** shall be advanced on a <u>current basis</u> . . . [.]" and would not await final disposition of a lawsuit. D.E. 28 at 4 (underline added). The Excess Insurers also disregard that coverage is triggered by a "Claim" for a "Wrongful Act," which is defined to include "any error, . . . act, omission, neglect, or breach of duty committed, attempted, or <u>allegedly</u> committed or attempted . . . by the **Organization**." *Id.* (underline added).

The notion that such a duty to advance is dictated by the duty to indemnify standard is contrary to the majority of courts, which "generally have viewed an insurer's duty to advance defense costs as an obligation congruent to the insurer's duty to defend." *Fed. Ins. Co. v. Sammons Financial Grp., Inc.,* 595 F. Supp. 2d 962, 976-77 (S.D. Iowa 2009). While no Massachusetts authority directly on point has been identified, one case from this Court, applying Kentucky law, ruled that the insurer had a duty to advance defense costs so long as the claim "suggests 'a reasonable potential for coverage.'" *Brown v. Am. Int'l Grp., Inc.,* 339 F. Supp. 2d 336, 346 (D. Mass. 2004)*; see also Shapiro v. Am. Home Assur. Co.*, 616 F. Supp. 906, 913 (D. Mass. 1985) ("the statement of the duty to reimburse costs of defense in the policies at issue here is at least as broad as the duty to defend under traditional liability insurance provisions"); *W Holding Co. v. AIG Ins. Co.-Puerto Rico*, 748 F.3d 377, 384–85 (1st Cir. 2014) ("Puerto Rico law holds that an

insurance company must advance defense costs if a complaint against an insured alleges claims that create even a 'remote possibility' of coverage").

This is particularly true for policies that, like the Chubb Primary Policy, contain provisions making clear the insurer will advance defense costs prior to final disposition of a claim.  Courts recognize that such language "necessarily contemplates potential, rather than actual, coverage." *See, e.g., Braden Partners, LP v. Twin City Fire Ins. Co.,* No. 14-CV-01689-JST, 2017 WL 63019, at *8–10 (N.D. Cal. Jan. 5, 2017).[2]  These courts reason that "[t]he  entire purpose of the duty to advance defense costs is to ensure that a policyholder has the insurance proceeds available to defend against an underlying action" and that this duty to advance defense costs would be illusory if a policyholder had to wait until the duty to indemnify was finally resolved because that duty "inevitably will not be defined until the adjudication of the very action which [the insurer] should have defended." *See Braden Partners,* 2017 WL 63019, at *11.

The Excess Insurers' position is also inconsistent with their own conduct.  They filed this lawsuit and only thereafter sent their denial letters, which were based solely on the allegations in the Underlying Litigation and at a time before any facts were determined.  D.E. 11-11.[3]  At the same time, while the Excess Insurers repeatedly argue a ruling on this Motion should await discovery, the Excess Insurers have not pointed to any facts that are needed before the Court rules on the discrete issues presented by this motion.[4]  Thus, discovery is unnecessary under the standard applicable to the duty to advance defense costs, which is based on the allegations in the Underlying Litigation and whether those allegations create a potential for coverage.

---

[2] *See also Julio & Sons Co. v. Travelers Cas. & Sur. Co. of Am.*, 591 F. Supp. 2d 651, 659 (S.D.N.Y. 2008) (applying Texas law) ("no material differences between a duty to defend and a duty to advance [d]efense [e]xpenses"); *Langdale Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 110 F. Supp. 3d 1285, 1301 (N.D. Ga. 2014) (concluding that duty to defend standard applied to assessing duty to advance); *Am. Chem. Soc. v. Leadscope, Inc.*, 2005-Ohio-2557, ¶ 22 (Ohio Ct. App. 2005) (applying potentiality standard to duty to advance); *Liberty Mut. Ins. Co. v. Pella Corp.*, 650 F.3d 1161, 1170 (8th Cir. 2011) ("the duty to advance defense costs, like the duty to defend, is determined by the facts alleged").

[3] The Excess Insurers falsely suggest Windsor failed to respond to their requests.  But as they recognized in amending the complaint, Windsor did not refuse any request.  *Compare* D.E. 8 ¶ 44 *with* D.E. 1 ¶ 44.

[4] The Excess Insurers point to the Windsor Insureds' service of discovery, but there are multiple claims, including the Windsor Insureds' cause of action for the insurers' violation of § 93A.

**II.    The Excess Insurers Do Not Dispute That Their Construction of the Professional Services Exclusion Would Swallow the D&O Coverage.**

The Excess Insurers do not dispute that, under Massachusetts law, courts strive to avoid interpretations of insurance policy exclusions that would defeat the intended coverage purchased by the insured and effectively "swallow the policy." *Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 568 N.E.2d 631, 634 (1991). Nor do the Excess Insurers dispute that their construction of the Professional Services Exclusion would effectively nullify any protection for Windsor under the D&O coverage.

Instead, the Excess Insurers double down on the purported breadth of the Professional Services Exclusion. Throughout their brief, the Excess Insurers repeatedly cite to websites regarding Windsor's purported activities. There are no allegations relating to any of the websites in the Underlying Litigation, so they are irrelevant to the Excess Insurers' duty to advance defense costs. But the websites also expose the radical nature of the Excess Insurers' argument. In citing the websites, the Excess Insurers point to nearly every activity that Windsor performs, including statements that Windsor has "earned a reputation for outstanding property maintenance" and that Windsor engages in maintenance, leasing, property management, collections, and technology. D.E. 32 at 1. The Excess Insurers sold excess D&O Insurance, covering broad "Wrongful Acts," to insureds that they knew were engaged in the residential real estate business. D.E. 28 at 17.[5] Defining all of Windsor's core business as professional services would swallow any D&O coverage for the Windsor Insureds. *Camp Dresser*, 568 N.E.2d at 634–35.

**III.    The Underlying Litigation Does Not "Arise From" Any "Professional Services".**

**A.    The Underlying Litigation Does Not Allege that Windsor Provided or Failed to Provide Any Services that Were "Professional" in Nature.**

As set forth in the Windsor Insureds' opening memorandum, Massachusetts has a decades-long line of cases narrowly construing the term "professional services." *See* D.E. 28 at 10-13. The

---

[5] While the Excess Insurers have never provided a coverage position with respect to the professional liability coverage, the Underlying Litigation also does not assert professional services within the meaning of that coverage part. Further, the Excess Insurers' assertion that Windsor is not intended to be covered under the professional liability coverage part is not supported by the Chubb Primary Policy. D.E. 11-3 at 15 of 120.

Excess Insurers' burden is particularly pronounced because the language is part of an exclusion, and the Excess Insurers do not dispute that exclusions must be strictly construed. D.E. 28 at 10.

In assessing whether an act constitutes a "professional" service, Massachusetts courts look at the act, not the actor. *See, e.g.*, *Med. Recs. Assocs., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 142 F.3d 512, 514 (1st Cir. 1998); *Camp Dresser*, 568 N.E.2d at 635; *Jefferson Ins. Co. of New York v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 677 N.E.2d 225, 229–30 (1997). "[C]ourts generally look to the nature of the conduct under scrutiny rather than to the title or the position of those involved." *Camp Dresser*, 568 N.E.2d at 634. A non-professional service does not become a professional one merely because it is performed by a professional. *Med. Recs. Assocs.,*142 F.3d at 514 ("even tasks performed by a professional are not covered if they are 'ordinary' activities 'achievable by those lacking the relevant professional training and expertise'").

Instead, Massachusetts courts have consistently construed "professional services" objectively, based on whether the service requires "specialized knowledge," advanced degrees, or "rigorous intellectual training." *See, e.g., Clermont v. Cont'l Cas. Co.*, 778 F. Supp. 2d 133, 139 (D. Mass. 2011); *Med. Recs. Assocs., Inc.*, 142 F.3d at 514; *Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co.*, 489 F.3d 71, 74 (1st Cir. 2007). "[M]embership in a profession has traditionally been recognized as requiring the possession of special learning acquired through considerable rigorous intellectual training . . .[.]" *Jefferson*, 677 N.E.2d at 229. Thus, courts often look to the degrees, licenses, or certifications required to perform in a field to assess whether such rigorous training and education are required. *See, e.g.*, *Cavanaugh v. United States*, 12-11378-DJC, 2014 WL 7409555, at *15 (D. Mass. Dec. 31, 2014) ("rehabilitation technician" is "an unlicensed position that requires no advanced degrees or training"); *Reliance Nat. Ins. Co. v. Sears, Roebuck & Co.*, 792 N.E.2d 145, 148 (2003).

The Excess Insurers' own assertions regarding Massachusetts law in prior cases align with the Windsor Insureds' position. *See* D.E. 28 at 13. The Excess Insurers acknowledge that they have, where it benefited them, argued that that "professional services" means "services rendered by a recognized professional in the fields of medicine, law, accounting, or architecture," and that

professionals are "distinguished by specialized training or education, state licenses, and legal liability for professional negligence or malpractice." D.E. 28 at 13. Nonetheless, they ask the Court to ignore the fact that they have specifically offered price-fixing as an example of an activity that would *not* qualify as a professional service under their policies. D.E. 19. While the Excess Insurers seek to distance themselves from their prior position due to defined policy terms, a review of the prior briefing shows that their arguments were detached from any specific definition of "professional services" and were based on a universal definition. D.E. 28 at 12-13, 19.

As their own filings in prior cases show, the Excess Insurers are aware that "professional services" is a narrowly defined term which does not expand to include all services performed by a large commercial entity simply because it is a large commercial entity. The Excess Insurers appear to concede that the setting of prices is not a professional service when performed by a small independent landlord. D.E. 32 at 9-10. Nonetheless, the Excess Insurers repeatedly claim that Windsor's size, success, sophistication and other business activities may affect whether the specific activities at issue in the Underlying Litigation are professional services, and that the Court therefore requires discovery into Windsor's operations to decide whether the act of determining rental prices is a professional service *specifically when Windsor does it.* D.E. 32 at 1-2, 9-10. This position, focused entirely on the "character of the party performing the act," is incongruent with applicable case law. *See, e.g.*, *Jefferson*, 677 N.E.2d at 229–30; *Camp Dresser*, 568 N.E.2d at 634; *Med. Recs. Assocs., Inc*, 142 F.3d at 514.

The Excess Insurers also imply that the alleged use of RealPage software changes the nature of Windsor's activities, twice posing the question of why "highly sophisticated software" was necessary to accomplish a non-professional service. D.E. 32 at 2, 10. However, the alleged use of software does not elevate the activity to a "professional" service any more than an independent landlord using market-price estimates from websites like Zillow or Redfin to set their listing price. Indeed, sophisticated software is used in nearly every business, big and small, and the alleged use of such software does not transform business activities into "professional services."

Ultimately, the setting of prices is a routine business function and does not constitute "professional" services. *See, e.g.*, *Med. Recs. Assocs.*, 142 F.3d at 517 ("setting a price for services and sending bills are functions of every business[,]" and medical records processing company's setting of prices were not "professional services"). Windsor's scale, success, and reputation for professionalism do nothing to convert pricing decisions into "professional" services.

**B.      The Underlying Litigation Does Not Allege that Windsor Provided or Failed to Provide Any "Services".**

The Excess Insurers do not dispute that there are only two paragraphs in the complaint in the Underlying Litigation about specific conduct by Windsor, and those allegations relate to Windsor's alleged use of RealPage software. D.E. 28 at 6. The Excess Insurers also do not point to any allegations from the Underlying Litigation that specifically refer to any services provided by Windsor – professional or otherwise. Nonetheless, the Excess Insurers contend that the Underlying Litigation relates to the setting of prices and that "one of the core services that Windsor provides to its residents is determining a fair rental price based on competitive market conditions in the local marketplace." D.E. 32 at 11.

The Excess Insurers cite no cases for the proposition that setting of prices is a service done for consumers, and this is not a reasonable construction of the term. The notion that lessees are paying lessors for the "service" of setting prices is inconsistent with this plain meaning of the term, which typically refers to an act performed for the benefit of another party.[6] In contrast, setting prices is a decision-making process undertaken by a seller or provider for its own benefit. Consumers view prices as conditions of purchase, not as a service provided by the seller or provider. *Cf. Reliance*, 792 N.E.2d at 148 n.4 (billing by attorney is not part of the services that a client expects to pay for). In sum, the Excess Insurers' contention that the Professional Services Exclusion bars coverage should be rejected because the Underlying Litigation does not allege any "services" that Windsor provided or failed to provide.

---

[6] A common dictionary definition of "services" is "work performed for remuneration." "Collins English Dictionary - Complete & Unabridged" 2012 Digital Edition, https://www.dictionary.com/browse/services.

7

**C.      The Underlying Litigation Does Not "Arise From" Any Professional Services.**

The Excess Insurers concoct an argument that the Windsor Insureds "do not dispute that the term 'based upon', 'arising from' or 'in consequence of' should be broadly construed." D.E. 32 at 13.  In fact, as set forth in their opening memorandum, the Windsor Insureds' position is that "arising from" is more stringent than but for causation and requires a meaningful linkage.  D.E. 28 at 15-16; *see also AIG Prop. Cas. Co. v. Green*, 217 F. Supp. 3d 415, 427 (D. Mass. 2016).[7]

The Excess Insurers cannot meet this standard.  The claimants in the Underlying Litigation do not allege that any professional services were owed to them, that Windsor failed to provide any professional services, or that Windsor breached any professional standard of care.  Rather, the Underlying Litigation relates to alleged industry-wide sharing of information using RealPage software in connection with the pricing of residential units.  *Massamont*, 489 F.3d at 74 (affirming no professional liability coverage after noting "remote causal connection is not enough").  In other words, the Underlying Litigation relates to the design and operation of RealPage's software, not any services, professional or otherwise, offered by Windsor.

In that regard, there are two key points that are not disputed.  First, the claimants in the Underlying Litigation are not limited to residents of Windsor-managed properties.  In other words, Windsor faces liability in the Underlying Litigation for the prices set by third parties, regardless of any price-setting function it performed for itself.  Second, the Underlying Litigation is devoid of any claims of malpractice or breach of professional duty.  The excess carriers seek to distinguish *Rob Levine & Assocs. v. Travelers Cas. & Sur. Co. of Am.,* 994 F. Supp. 2d 228, 233 n.7 (D.R.I. 2014), because it applies Rhode Island law, but it is consistent with Massachusetts law.  *See, e.g., Welch Foods, Inc. v. Nat'l Union Fire Ins. Co.*, No. 09-12087, 2010 WL 3928704, at *5 (D. Mass.

---

[7] The Excess Insurers cite *Saint Consulting Grp., Inc. v. E. Ins. Grp., LLC*, No. MICV201202218, 2014 WL 1260510 (Mass. Super. Jan. 28, 2014), which, in the Excess Insurers' words, "specifically rejected" the decision of *Roe*, 587 N.E.2d at 217.  The Superior Court had no authority to "specifically reject" the binding precedent of the Supreme Judicial Court.  In any event, that case dealt with a professional services exclusion that more broadly excluded claims "in any way related" to professional services – language that the Excess Insurers could have used but did not.

Oct. 1, 2010) (no coverage under professional liability policy for antitrust claims where the claims did not pertain to any breach of professional duties), *aff'd* 659 F.3d 191 (1st Cir. 2011).

**IV.    Massachusetts Law Requires Resolution of Ambiguities in Insurance Policies in Favor of Coverage, Regardless of an Insured's Size or Sophistication.**

To the extent the Windsor Insureds' construction of the Professional Services Exclusion is not the only interpretation, it is at minimum a reasonable one.  The Excess Insurers do not dispute that, even in the face of prior Massachusetts cases finding the undefined term "professional services" to be ambiguous, neither the Excess Insurers nor Chubb did anything to clarify the language.  *Jefferson*, 677 N.E.2d at 228.  The Excess Insurers also offer no valid explanation for their shifting positions on "professional services" from prior cases.  D.E. 28 at 12-13, 19.

Although Chubb agreed to advance Windsor's defense costs, the Excess Insurers ask the Court to disregard this fact as irrelevant.  The Excess Insurers argue that, because Chubb's agreement to advance was under a reservation of rights, it is not noteworthy.  Reserving rights is a common and well-accepted practice in the insurance industry, designed to protect insurers while they fulfill their defense obligation.  *Three Sons, Inc. v. Phoenix Ins. Co.*, 257 N.E.2d 774, 777 (Mass. 1970).  The act of reserving rights does not diminish the import of Chubb's acknowledgment of its obligations as evidence that Windsor's construction of the Professional Services Exclusion is a reasonable one.

Disregarding well-established Massachusetts law, the Excess Insurers also incorrectly contend that any ambiguities should not be construed in the Windsor Insureds' favor because the Windsor Insureds are "sophisticated."  The Supreme Judicial Court recently made it clear to one of the Excess Insurers this is not Massachusetts law. *See Zurich Am. Ins. Co. v. Med. Properties Tr., Inc.*, 237 N.E.3d 733, 743 (Mass. 2024) (construing ambiguities in favor of insured real estate investment business); *see also Vermont Mut. Ins. Co. v. Zamsky*, 732 F.3d 37, 43 (1st Cir. 2013) (interpreting ambiguous language in favor of coverage is an "interpretive principle long hallowed by the [Supreme Judicial Court]"); *Jefferson*, 677 N.E.2d at 228 n.11 (construction of ambiguities in favor of coverage applies even in litigation involving sophisticated parties).  For more than a

century, Massachusetts courts have held to this rule, even where the insured was a large and successful business entity. *See, e.g.*, *Holyoke Mut. Ins. Co. in Salem v. Vibram USA, Inc.*, 106 N.E.3d 572, 575 (2018) (multi-national footwear company); *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 555 N.E.2d 576, 583 (1990) (long running paper company).   Any ambiguities in the Professional Services Exclusion should be construed in favor of coverage.[8]

## V.      Defendants are Entitled to Recover Attorneys' Fees.

The Excess Insurers concede that Massachusetts allows an insured to recover attorneys' fees when it prevails after being forced into litigation by an insurer that refuses its obligation to defend its insured.  D.E. 32 at 16-17.  The rationale for this rule is that if an insured has to pay for litigation to compel the insurer to cover the costs of the underlying case, the insured ends up in the same position as if it never bought insurance, effectively being deprived of the policy benefits it paid for.  *Preferred Mut. Ins. Co. v. Gamache*, 686 N.E.2d 989, 992–93 (1997).

That rationale is in no way obviated in the case of D&O policies, which customarily obligate the insurer to advance defense costs rather than to control the defense. *Brown*, 339 F. Supp. 2d at 344.  In both cases, the insured is forced to bear significant legal expenses to defend the underlying action and risks immediate negative consequences from the insurer's failure to meet its obligations. There is no basis for distinguishing between the harm suffered by an insured who must pay for his own defense because the insurer has not retained counsel for him and the insured who must pay for his own defense because the insurer has not advanced defense costs to him.

## CONCLUSION

For these reasons, the Windsor Insureds respectfully request that the Court grant their Motion for Partial Judgment on the Pleadings.

Dated: August 29, 2024                                            Respectfully submitted,

---

[8] There is no reason why the principle should be disregarded based on the identity of the Windsor Insureds, particularly when the Professional Services Exclusion is part of Chubb's standard-form policy. *Com. Union Ins. Co. v. Walbrook Ins. Co.*, 7 F.3d 1047, 1053 n.8 (1st Cir. 1993) (noting that "sophisticated parties" exception is rarely applied when the insured did not "actively participate" in drafting language).

*/s/ Joseph M. Saka*
Andrew M. Reidy (BBO 550808)
Joseph Saka (pro hac vice)
Scott Boyle (pro hac vice)
NOSSAMAN LLP
1401 New York Avenue NW
Suite 800
Washington, D.C. 20005
Telephone: (202) 887-1412
areidy@nossaman.com
jsaka@nossaman.com
sboyle@nossaman.com

**Counsel for Defendants/Counter-Plaintiffs**

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 29, 2024.

*/s/ Joseph Saka*

11